Harold A. MILLER et al.

v.

The UNITED STATES.

No. 296–74.

United States Court of Claims.

March 17, 1976.

Manley B. Strayer, Portland, Or., attorney of record for plaintiff; Davies, Biggs, Strayer, Stoel & Boley, Tonkon, Torp & Galen, Portland, Or., and Ragan & Mason, Washington, D. C., of counsel.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Peter R. Taft, Washington, D. C., for defendant.

Before SKELTON, NICHOLS and BENNETT, Judges.

NICHOLS, Judge.

Plaintiffs, owners of valuable California forest lands, bring this action for just compensation under the Redwoods National Park Act, Pub.L. 90–545, 82 Stat. 931, 16 U.S.C. §§ 79a–79j. That Act vested in the United States immediate title to an area described by reference to maps, by legislative enactment pure and simple, uncomplicated by any necessity for subsequent executive action. The Secretary of the Interior was to settle claims of the former owners for just compensation, and in the absence of agreement, they were directed to sue in this court. Part of plaintiffs' land being thus taken, and part remaining in their ownership, their claim includes substantial sums for injury to land not taken.

The settlement negotiations brought to light an unfortunate situation. The area taken includes a narrow corridor connecting wider tracts to the north and south, and this corridor, which contains no primeval redwoods, cuts right across the plaintiffs' only access to the large area of their ownership, to the eastward, and to a smaller area, also not taken, called the "Demonstration Forest", which is surrounded by corridor lands. The authorization limit for the whole Park was $92,000,000. For the land taken, 2,737.40 acres, and damage to land not taken, plaintiffs claim $87,008,539, towards which they acknowledge payments totalling $11,687,955, in money and in exchanged lands. If the access problem can be resolved as defendant has attempted to do, the claim is only $7,669,771, but if as plaintiffs believe, it is unsolvable under existing legislation, $75,320,584 is the claim, plus interest as part of just compensation. Defendant has filed corrective maps in the state land records, and the parties have made a contract, purporting to remove 90.-78 acres from the taking area, to restore plaintiffs' access to their land not taken, and to enlarge the Demonstration Forest area. The notice of this filing, in the Federal Register, describes the new maps as delineating and describing the lands taken in the legislative taking. 36 Fed. Reg. 19518 (1971). The access route would sever the north-south corridor and divide the Park in two, but this appears to defendant less of an evil than the enormous severance damage claim with which it is faced. Plaintiffs would be happy to take the 90.78 acres in lieu of the severance damages, but deny that defendant has power to dispose of park

lands vested in the United States in this manner, or that it has followed the correct procedure even if it has such power.

The case is before us on cross motions for partial summary judgment. The facts are undisputed and the issue seems an appropriate one for disposition by that medium, preliminary to a trial on the value of the land taken, if one is necessary. Our problem is, therefore, to determine whether or not the 90.78 acres have been effectually removed from the park and restored to private ownership, so that they never were in the park for the purposes of assessing plaintiffs' claim. We hold that this is the result.

The text of Redwoods National Park Act, Secs. 2(a) and 3(b)(1) are both important and read as follows:

> Sec. 2. (a) The area to be included within the Redwood National Park is that generally depicted on the maps entitled "Redwood National Park," numbered NPS–RED–7114–A and NPS–RED–7114–B, and dated September 1968, copies of which maps shall be kept available for public inspection in the offices of the National Park Service, Department of the Interior, and shall be filed with appropriate officers of Del Norte and Humboldt Counties. The Secretary of the Interior (hereinafter referred to as the "Secretary") may from time to time with a view to carrying out the purpose of this Act and with particular attention to minimizing siltation of the streams, damage to the timber, and assuring the preservation of the scenery within the boundaries of the national park as depicted on said maps, modify said boundaries, giving notice of any changes involved therein by publication of a revised drawing or boundary description in the Federal Register and by filing said revision with the officers with whom the original maps were filed, but the acreage within said park shall at no time exceed fifty-eight thousand acres, exclusive of submerged lands.
>
> Sec. 3. * * *

> (b)(1) Effective on the date of enactment of this Act, there is hereby vested in the United States all right, title, and interest in, and the right to immediate possession of, all real property within the park boundaries designated in maps NPS–RED–7114–A and NPS–RED–7114–B, except real property owned by the State of California or a political subdivision thereof and except as provided in paragraph (3) of this subsection. The Secretary shall allow for the orderly termination of all operations on real property acquired by the United States under this subsection, and for the removal of equipment, facilities, and personal property therefrom.

Defendant with its cross motion furnishes copies of Maps NP–RED–7114–A and –B, which are now conceded to be the maps Congress referred to. The "S" in "NPS" was an inadvertent error in the statute, but without legal significance.

Defendant relies on the authority given in Sec. 2(a) to "modify" the park boundaries, as the source of power to exclude the 90.78 acres. Omitting for the moment procedural questions, plaintiffs' point is that by the Act's own language, Sec. 3(b)(1), "all right, title and interest in" the land, within the boundaries shown on the maps, vested in the United States. It relies then on the usual rule that United States officials cannot dispose of Government land without express statutory authority to do so.

As to the immediate vesting of title our decisions in *Drakes Bay Land Co. v. United States*, 424 F.2d 574, 191 Ct.Cl. 389 (1970), and *Rocca v. United States*, 500 F.2d 492, 205 Ct.Cl. 275 (1974), do not bear the weight plaintiffs put on them. In the former case we were discussing other legislation and in pointing out that the Redwood National Park Act was different in vesting immediate title, we had no reason to spell out whatever minor qualifications there might be to that statement. In *Rocca*, likewise, we were explaining the differences between the takings under the Redwood Act and those made in what is called "inverse condemnations", *i.e.*, where the claimant suing

under the Tucker Act, 28 U.S.C. § 1491, must show whether the Government has taken at all, and if so, when. Such statements, wrenched from their original context, cannot be fathered on the court in wholly different contexts.

We may concede, however, that in the absence of Sec. 2(a), the plaintiffs clearly would be right. The most immediately relevant authority is *United States v. Sunset Cemetery Co.*, 132 F.2d 163, 164 (7th Cir. 1943). That case deals with the Declaration of Taking Act, 40 U.S.C. § 258, and holds that before § 258(f) was added in 1942, a Declaration purporting to take a fee was irrevocable and the interest taken could not be diminished by amendment. § 258(f) was added to allow effect to be given to a stipulation or agreement by the Attorney General to exclude any property or any part thereof, or interest therein. § 258(f) does not apply to this case except as showing how Congress has dealt with the instant problem when it recognized its existence. Sec. 2(a) of the Redwoods Act is less clear.

Plaintiffs point out that the Senate and House bills that became the Redwoods Act both laid out general areas by reference to a map, but without any legislative taking. Land was to be purchased or condemned within the areas for the park from time to time. *I.e.*, the scheme was like that discussed by us in *Drakes Bay Land Co., supra*. The Senate bill allowed the Secretary to make "boundary revisions" which were to be "minor adjustments", but limited to not over the park area, as contemplated, of 64,000 acres. The Secretary was not to depart from the "general boundaries described in the bill to make major acquisitions * * *" Senate Rep. No. 641, U.S. Code Cong. & Admin. News, Vol. 3 (1968), p. 3928.

The House bill was similar but provided a smaller ultimate area. The Conference Committee figure of 58,000 acres was a compromise. But the Conference Committee added a feature that was not in either the Senate or House bills: the immediate legislative taking. The reason for this was perception of an "emergency" in concern lest cutting of "these precious trees" would go on after enactment pending further legislative and administrative measures, because title would not at once vest in the United States. Speech of Senator Jackson, Committee Chairman, Con. Rec. Sept. 19, 1968, p. 27583. Another reason was to stop land price escalation on the taking date. *See*, Cong. Rec., *supra*, at 27582.

Plaintiffs apparently believe that by the introduction of the legislative taking the Congress drastically curtailed the authority to modify boundaries, though it remained stated in similar terms. Before this change, no doubt, the boundary could be readily moved outwards or inwards, at least at the outset, because no title vested in the United States until, at some later date, a declaration of taking was filed which would vest it, or until a court decree was obtained in a condemnation case, or a deed obtained from a grantor. In plaintiffs' view, under the law as enacted, the boundary could be moved only outwards, to add land to the legislative taking, not inward to subtract. This would greatly reduce the scope of the authority, though plaintiffs also call attention to the heavy, broad lines the Conference Committee drew on the map. Blown up to full size on the ground, these lines would become strips of substantial width, whose ownership the Secretary would need to establish.

Of course, outward modification of the lines would soon run up against the statutory 58,000 acres overall limitation unless it was matched by inward modification elsewhere. The Conference Committee enumerated areas which add up to 55,625 acres. This includes three state parks but not the highways the state was expected to donate. 3 U.S. Code Cong. & Admin. News (1968) at 3934. Thus plaintiffs would allow the modification authority but a limited scope indeed. The rule of giving full effect to every part of an enactment does not, in plaintiffs' view, have so much force when it is a question of language added by a Conference Committee to meet a perceived emergency, subverting language that was in the bill all along.

■ We are impressed by the ingenuity of this analysis, but do not think it is sound. In the first place, the statutory word "modify" is more appropriately applied to a diminution than to an increase, so far as there is a difference. Webster's definitions in the third Unabridged Ed. include several preferred meanings limited to diminution only. *E.g.*, "1. To make more temperate and less extreme * * * 3a To limit or restrict the meaning of." No definition is limited to increase only. Unless the context requires otherwise, words are construed according to their ordinary meaning in common speech, and in statutory construction, courts resort to authoritative dictionaries to establish what the ordinary meaning is. For a recent instance, *see State Bank of Albany*, 530 F.2d 1379, 208 Ct.Cl. —— (Decided February 18, 1976). Our resort to the dictionary adduces no support for the meaning of "modify" urged by plaintiffs, which would confine it to instances of expansion only and exclude contraction.

* * * It is true that a court in interpreting a provision in a statute may imply an exception to general terms used therein, but it will do so only where to apply the general term literally would lead to absurd results, contrary to the manifest Congressional purpose as revealed by the statute as a whole and as confirmed by its legislative history. * * * (*Otoe and Missouria Tribe of Indians*, 131 F.Supp. 265, 275, 131 Ct.Cl. 593, 608, *cert. denied*, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955)).

In the second place, the Conference Committee did not report the bill with the authority to "modify" still in it by mere haste and inadvertence. The Committee's section by section analysis says the Secretary "may periodically adjust the boundaries of the park." Cong. Rec., Sept. 19, 1968, p. 27579. Use of the word "adjust" instead of "modify" shows that the writer of the analysis did not merely parrot the language of the bill without thinking about it.

Third, this present case illustrates that, as Congress could not but have seen, the sudden and flat-out taking of title on enactment would increase and not diminish the need for authority to make "adjustments", moving the line either in or out as the occasion might demand. It would be strange to amend the bill to take away a power granted in prior versions, while increasing the need for that power.

Fourth, there is no hopeless inconsistency or anomaly in vesting title absolutely, yet providing for a divesting of title by boundary revision elsewhere in the legislation, in certain circumstances, either *nunc pro tunc* or as of a later date. It is for the courts to ascertain what Congress intended to accomplish and effectuate that intent, not to distort that intent to fit preconceived notions of conveyancing propriety. As defendant appropriately quotes:

* * * Yet it will not do for us to tell the Congress "We see what you are driving at but you did not use choice words to describe your purpose." (*United States v. Union Pacific R. Co.*, 353 U.S. 112, 118, 77 S.Ct. 685, 688, 1 L.Ed.2d 693, 697 (1957)).

Looking, as we must, for the intent of Congress as our guiding star, the supposed difficulty about divesting an absolute title does not impress as a valid reason why Congress would not have wanted the Secretary to use his power to modify the Park boundaries as he has used it here.

■ Plaintiffs' only other substantive point we should notice is that the saving of liability for severance damages is not a "purpose of the Act" for which the Secretary can "modify" a boundary. The Act recites that the purpose is to save the redwoods. A secondary purpose, for which full provision was made in the statute, was to assure just compensation to expropriated landowners. We presume the purposes of any Act are those shown by its terms and history to be the express concern of Congress. The modification here involved did not cost any primeval redwoods and it was done to effectuate or bring nearer a fair and just settlement with an important claimant, one whose claim Congress anticipated with concern. We think the choice of

this measure was within the Secretary's discretion and effectuated a purpose of the Act.

We think the Secretary's discretion was also broad enough to modify the boundary *nunc pro tunc* with the original taking date which established that boundary. It is necessary that he do so here to effectuate the object of eliminating severance damages. Thus the title to the involved 90.78 acres remains continuously in the plaintiffs with no period of Government ownership. Since the statute authorizes the Secretary to modify "from time to time", what he may do after the original taking claims are settled, and for other purposes, does not concern us here.

■■■ The plaintiffs' procedural points are two. First, the Secretary failed to give notice of the boundary changes here involved by publication in the Federal Register, as required, either of a revised drawing or a "boundary description". He published there, in fact, a brief notice referring to maps that were available for consultation elsewhere. We find it unnecessary to determine whether he complied with the Act because in any event, we do not consider that a person who received actual notice has standing to complain that notice by publication was not given. Clearly the plaintiffs had actual notice. As a normal matter, failure to publish a notice in the Federal Register when required does not impair the validity of the executive action published as regards persons who have had actual notice. 44 U.S.C. § 1507. The instant legislation cannot be read to create an anomalous exception to this rule.

Second, plaintiffs urge that the Secretary failed to make proper delegations of authority to the persons who modified the boundaries and published the Register notice and the maps. The defendant seems to have effectually refuted the objection, or else shown ratification, by the matter submitted with its cross motion.

In accordance with the foregoing, plaintiffs' motion for partial summary judgment is denied. Defendant's motion to dismiss or for partial summary judgment is allowed.

Count one of plaintiffs' petition is dismissed. It is determined and adjudicated that within the meaning of the Redwood National Park Act, the Secretary of the Interior has validly modified the boundaries of the said Park so as to exclude from it *nunc pro tunc* from the date of enactment, October 2, 1968, all the lands of the plaintiffs, amounting to 90.78 acres, more or less, referred to in the said Count 1, paragraph 7. For purposes of this case, the said lands are deemed never to have been taken for the said Park. The cause is remanded to the trial division for further proceedings in accordance with this partial summary judgment.