INTER–COASTAL XPRESS,
INC., Plaintiff,

v.

THE UNITED STATES, Defendant.

No. 00–441C.

United States Court of Federal Claims.

June 12, 2001.

Leo S. Fisher, Arlington, VA, attorney of record for plaintiff.

Bryant S. Banes, Department of Justice, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, for defendant. David M. Cohen, Director, and Robert E. Kirschman, Assistant Director.

## OPINION

FUTEY, Judge.

This case is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction. Plaintiff opposes defendant's motion, and in the alternative has brought a motion for leave to amend its complaint. Plaintiff Inter–Coastal Xpress, Inc. entered into contracts with the Department of Defense (DOD), acting on behalf of the United States government (defendant), for the transportation of perishable foods. Plaintiff has brought suit in this court, alleging a breach of contract due to defendant's failure to pay plaintiff's costs associated with delays caused by defendant. Defendant claims that pursuant to the Interstate Commerce Act (ICA) plaintiff's claims are time-barred by a three-year statute of limitations. Plaintiff counters that the ICA does not apply in this case, because the breach of contract in question is covered by the Contract

Disputes Act (CDA). Plaintiff therefore contends that the statute of limitations of the CDA, allowing the filing of a suit within 12 months of a final decision by the contracting officer (CO), applies in this case, and that plaintiff's claims are properly before the court. In the alternative, plaintiff requests leave to amend its complaint to include additional causes of action, based on due process and the Tucker Act, if the court finds that its claims are barred by the applicable statute of limitations.

### Factual Background

In April 1994, DOD, through the Defense Logistics Agency (DLA), invited bids for the transportation of "perishable subsistence" for a three-year period, from October 1, 1994, until September 30, 1997. The Defense Personnel Support Center (DPSC), a division of DLA, sent the form invitations to potential bidders. The invitations contemplated an arrangement under which each individual shipment would be carried out by execution of a government bill of lading (GBL). Potential contractors could bid to provide transportation services for various divisions of the Defense Subsistence Office (DSO). The invitations included four copies of the form Perishable Subsistence Carrier Rate Tender and Service Offer (Tender); a bidder had to complete a Tender for each DSO division for which it wished to provide services.

Plaintiff completed the four copies of the Tender, submitting offers to serve DSO in Fort Worth, San Antonio, El Paso, and New Orleans. In its Tenders, plaintiff submitted, as instructed, a "single rate per one hundred pounds of freight to be shipped," termed a "line haul charge." Plaintiff's line haul charges did not include its calculations for possible additional charges for delays caused by DOD or its subdivisions. Additional charges may accrue to DOD, for example, when it demands "holdovers," situations in which a carrier such as plaintiff is required to pick up a shipment in the evening, and

then wait until the next morning to make the delivery. Item 28 of each Tender provides input spaces for various line haul charges for different routes and sizes of delivery. Item 29 of each Tender provides separate spaces to enter the rates for holdover charges. Plaintiff believed that it was required by the Tender forms to include its line haul charge in Item 28 separately from its proposed additional charges for holdovers. Plaintiff understood that it had to include those additional charge rates in Item 29.

DOD awarded plaintiff the contracts for Fort Worth, San Antonio, and New Orleans, and the parties entered into tender agreements [1] to that effect. When the tender agreements were signed, the plaintiff's representative certified that he was qualified to bind plaintiff to a contract with the government pursuant to the ICA.

Once performance began on the contracts, however, DOD did not pay plaintiff the holdover charges incurred when shipments were held overnight. DPSC attempted to change the manner in which it paid plaintiff to include holdover charges. Thereafter, all payments for shipments originating out of DSO New Orleans that were delayed overnight or over the weekend included the appropriate holdover charges. At DSO in Fort Worth and San Antonio, however, very few of the holdover charges accrued by DOD were paid. In May 1995, after numerous telephone discussions, plaintiff wrote to DSO in Fort Worth and San Antonio, as well as DPSC and Military Traffic Management Command (MTMC), asking that holdover charges be included in the payments. Plaintiff wrote DPSC again in June 1995, after having received no response to its letters. In July of that year, MTMC replied to the inquiries, taking the position that plaintiff should have worked charges for holdovers as well as other additional rates and expenses into its line haul charges, and that DOD would not pay holdover charges in addition to what it had already paid. In September 1995, plaintiff

---

1. For purposes of clarification, the term "Tender" relates to bids prepared by plaintiff for the transportation services involved in this case; the term "tender agreement" represents the awards to plaintiff for the services and the executed documents memorializing those awards; the term "contract(s)" refers to the whole of the contractual relationship between the parties, consisting of the tender agreements and the GBLs together.

received a letter from MTMC which maintained the earlier refusal to pay holdover charges and also requested repayment for alleged overcharges from holdovers previously paid by DOD to plaintiff. Later correspondence between the parties revealed no change in DOD's position.

Plaintiff apparently completed work on the contracts, providing transportation services from October 1, 1994, to September 30, 1997. On each shipment plaintiff made during this time, it submitted a claim for payment for its services to defendant. Plaintiff alleges that it included holdover charges when appropriate. Defendant made payments for the services usually within three weeks of delivery, but it declined to pay the allegedly applicable holdover charges in most cases. Plaintiff therefore submitted its claims directly to the General Services Administration (GSA), in order to resolve the disputed charges. Between November 29, 1996, and November 7, 1997, plaintiff made 2,416 claims for holdover charges to the GSA Office of Transportation Audits (OTA). OTA denied two of plaintiff's claims, on September 29, 1997, and November 20, 1997, respectively, for the reason that the GBLs in question did not include requests for payment for holdover charges. OTA did not act on the rest of plaintiff's claims. Plaintiff then submitted all of its claims to the GSA Board of Contract Appeals (GSBCA). GSBCA reviewed only the two denied claims, and dismissed the 2,414 remaining claims as prematurely filed. _Inter-Coastal Xpress, Inc._, 99–1 B.C.A. (CCH) ¶ 30,370 (G.S.B.C.A. Mar. 19, 1999). Finally, on August 8, 1999, DOD, in accordance with pertinent regulations, issued 2,308 Settlement Certificates denying plaintiff's claims. Each Settlement Certificate simply cited the GSBCA decision and denied the specific claim without further explanation. Thirty-five claims remain undecided. Of all the claims, approximately 200 were based on deficient payments received by plaintiff on or after July 26, 1997. In addition, close to 170 claims for shipments involving holdover charges have no corresponding check for payment on the line haul charges. It is unclear, therefore, to which shipments and deficient payments these holdover charges

relate, and on what date the deficient payments, if any, were made.

Based on OTA's denials, plaintiff brought a lawsuit in this court on July 26, 2000. Defendant filed its motion to dismiss on September 12, 2000. In its response of October 12, 2000, plaintiff included a motion for leave to amend its complaint. On May 22, 2001, the court heard oral argument on both motions.

### _Discussion_

### I. *Motion to Dismiss*

Defendant has moved to dismiss plaintiff's claims pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction. In ruling on such a motion the court must accept as true the complaint's undisputed factual allegations and construe them in a light most favorable to plaintiffs. _Scheuer v. Rhodes_, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); _Hamlet v. United States_, 873 F.2d 1414, 1415 (Fed.Cir.1989); _Farmers Grain Co. v. United States_, 29 Fed.Cl. 684, 686 (1993). If the undisputed facts reveal any possible basis on which the non-moving party may prevail, the court must deny the motion. _Scheuer_, 416 U.S. at 236, 94 S.Ct. 1683; _W.R. Cooper Gen. Contractor, Inc. v. United States_, 843 F.2d 1362, 1364 (Fed.Cir.1988). If the motion challenges the truth of the jurisdictional facts alleged in the complaint, however, the court may consider relevant evidence in order to resolve the factual dispute. _Rocovich v. United States_, 933 F.2d 991, 994 (Fed.Cir. 1991). "The court should 'look beyond the pleadings and decide for itself those facts, even if in dispute, which are necessary for a determination of [the] jurisdictional merits.'" _Farmers Grain_, 29 Fed.Cl. at 686 (quoting _Raymark Indus., Inc. v. United States_, 15 Cl.Ct. 334, 335 (1988)). Plaintiffs bear the burden of establishing subject matter jurisdiction. _KVOS, Inc. v. Associated Press_, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936); _Rocovich_, 933 F.2d at 993.

### A. **Application of the CDA or the ICA**

■ Defendant alleges that plaintiff's claims are time-barred. Defendant rests its argument on the assertion that the ICA applies to the tender agreements and GBLs in this case, and that the ICA's three-year stat-

ute of limitations for bringing a lawsuit had passed on plaintiff's claims before plaintiff filed suit in this court on July 26, 2000. Plaintiff disagrees and instead maintains that the ICA does not control. Although the ICA applies to transportation contracts in which GBLs make up the sole source of contractual agreement between the parties, plaintiff argues, it does not apply when tender agreements as well as GBLs constitute the parties' contractual obligations. When tender agreements are involved, plaintiff states, the CDA applies, and therefore the CDA's statute of limitations is operative in this case.

A brief introduction of the two statutes is in order. The ICA was first enacted in 1887 to arrest "discriminatory and destructive business practices" in the railroad industry. *Tri–State Motor Transit Co. v. United States*, 39 Fed.Cl. 485, 488 (1997); *see* Act of Feb. 4, 1887, ch. 104, 24 Stat. 379. Since that time the ICA's scope has been enlarged to include other forms of transportation, including transportation furnished by motor carriers. *See* Motor Carrier Act, ch. 498, 49 Stat. 543 (1935). The ICA has been interpreted to retain a broad and inclusive scope in order to give effect to its evident purpose of remedying discriminatory practices in transportation services. *Interstate Commerce Comm'n v. Interstate Auto Shippers, Inc.*, 214 F.Supp. 473, 476 (S.D.N.Y.1963). The ICA created the Interstate Commerce Commission (ICC), which regulated transportation among the states, as well as between the United States and foreign countries. *See, e.g.*, 49 U.S.C. § 10521 (1994) (current version at 49 U.S.C. § 13501 (Supp. I 1995)). Under the ICA, ICC attempted to prevent discriminatory actions against, and favoritism toward, shippers, including cases in which the United States government was involved. ICC was abolished on January 1, 1996, by the ICC Termination Act of 1995, Pub.L. No. 104–88, § 101, 109 Stat. 803, 804.[2] The responsibilities of ICC covering motor carriers were delegated to the Surface Transportation Board (STB) and the Federal Highway Administration (FHA). *Cross v. Dep't of Transp.*, 127 F.3d 1443, 1445 (Fed.Cir.1997).

The ICA requires carriers in most cases to publish "tariffs" that make public the carriers' rates for transportation services. 49 U.S.C. § 13702 (Supp. I 1995). Carriers must then charge at the published rates. Charging a different rate than that published to STB is a violation of the ICA. *Id.* STB has the authority to prescribe the form and manner of tariff filing. § 13702(b)(1). Disputes over contracts for transportation services are covered by 31 U.S.C. § 3726 (Supp. IV 1998), which provides the administrative dispute resolution scheme for the ICA. Carriers can take claims to GSA, and may appeal GSA's decision to GSBCA. Regulations implementing section 3726 are located at 41 C.F.R. pt. 101–41 (1999).[3] Carriers may also make complaints to STB, or file a civil action in the courts. 49 U.S.C.A. §§ 14701–14709 (West 1997 & Supp. 2000).

Next, the CDA stems from a federal contracts tradition requiring the submission of claims to the CO before proceeding to court. Congress enacted the CDA, codified at 41 U.S.C. §§ 601–613 (1994 & Supp. III 1997), in 1978 for the purpose of "provid[ing] a swift, inexpensive method of resolving contract disputes." *Elkins v. Gober*, 229 F.3d 1369, 1374 (Fed.Cir.2000) (internal quotations omitted). The CDA negated the previous need for the inclusion of a "disputes clause" in every government contract. *Oroville–Tonasket Irrigation Dist. v. United States*, 33 Fed.Cl. 14, 19–21 (1995). This statute streamlines the process by which an aggrieved contractor makes its claims concerning disputes arising from contracts with executive agencies. It provides a specific process that must take place before the contractor files suit in this court. *City of Burbank v. United States*, 47 Fed.Cl. 261, 269 (2000).

**2.** The Termination Act took effect in 1996. Because the contracts in this case were performed from 1994–97, some of the former provisions of the ICA are applicable to this case. The Termination Act, however, did not make substantive changes to the applicable former provisions. For ease of reference, therefore, the court will utilize the section numbers presently in effect, unless it is necessary to consider the former provisions.

**3.** The regulations were amended and recodified in 2000, and are now located at 41 C.F.R. pt. 102–118.

The CDA applies to a range of government contracts:

(a) Executive agency contracts

Unless otherwise specifically provided herein, this chapter applies to any express or implied contract (including those of the nonappropriated fund activities described in sections 1346 and 1491 of Title 28) entered into by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or,

(4) the disposal of personal property.

41 U.S.C. § 602(a). When a claim is within the CDA's jurisdiction, a contractor claiming damages against the government must meet certain jurisdictional prerequisites. Specifically, the contractor must submit a written claim to the CO. 41 U.S.C. § 605(a). A claim originating from a contract awarded before October 1, 1995, must be certified by the contractor when the claim amount is $50,000 or more. *See Burbank*, 47 Fed.Cl. at 270 nn. 14, 15 (explaining that the Federal Acquisition Streamlining Act of 1994, Pub.L. No. 103–355, 108 Stat. 3243, changed the certification requirement from $50,000 to $100,000). The contractor must certify that it has made the claim in good faith, that the supporting data and payment requested are accurate, and that the person certifying the claim has authority to do so. 41 U.S.C. § 605(c)(1). A response from the CO is required within 60 days. 41 U.S.C. § 605(c)(2). Once the claim is denied or the CO neglects to respond to a claim within 60 days, the contractor may institute judicial proceedings. 41 U.S.C. § 605(c)(2), (5).

The court must determine whether the ICA or the CDA applies to the transportation contracts at issue in this case, contracts which consist of tender agreements and GBLs. Although this court has within its precedent a decision that prescribes the preemption of the CDA in favor of the ICA in all transportation cases, *Northeastern Penn. Shippers Coop. Ass'n, Inc. v. United States,* 32 Fed.Cl. 72 (1994), subsequent case law of the Federal Circuit has made this proposition less definite. Two case histories provide the starting point for the court's analysis. First, in *A–Transport Northwest Co. v. United States,* 27 Fed.Cl. 206 (1992) (*A–Transport I*), aff'd, 36 F.3d 1576 (Fed.Cir.1994) (*A–Transport II*), this court held that a tender agreement between the government and a carrier establishing a twelve-month period for the transportation of perishable subsistence was susceptible to treatment as a binding contract. In that case, the government had canceled the tender agreement before any shipments were made, and therefore no GBLs existed. In rejecting defendant's argument that the tender agreement was merely a continuing offer to enter into transportation contracts, the court stated that the agreement had all the markings of a government procurement contract, and would be treated as such. *A–Transport I*, 27 Fed.Cl. at 215–17. The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) added that had the parties executed GBLs, such GBLs could have added contractual obligations to the tender agreement, but they were not necessary; the tender agreement could stand alone as an enforceable contract. *A–Transport II*, 36 F.3d at 1581.

Unfortunately, the *A–Transport* cases do not explain whether the CDA would apply to such a contract. In these cases, the Court of Federal Claims and the Federal Circuit found independently that this court has subject matter jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491 (1994 & Supp. II 1996). Yet, the two holdings fail to shed light on whether the ICA, a more specific statute governing certain types of transportation disputes, is applicable to a claim in this court arising from the execution of a tender agreement for transportation services for the government. This question is an important one, because its answer can change the ability of a claimant to bring suit in this court, as well as change the procedure by which it brings such a claim. While the Tucker Act states broadly that the court has jurisdiction over any claim based on a contract, express or implied, with the United States, 28 U.S.C. § 1491(a), secondary statutes, such as the CDA and the ICA, may alter that broad grant of jurisdiction. *See Corporate Air v.*

*United States,* 26 Cl.Ct. 204, 207 (1992); *Gordon v. United States,* 227 Ct.Cl. 328, 338, 649 F.2d 837 (1981). The obvious example is the claims procedure provided in the CDA, which requires a claim, certification of that claim, and a final decision from the responsible government agency's CO, before commencing suit in this court. *Corporate Air,* 26 Cl.Ct. at 207. This procedure specifically changes a claimant's right to proceed directly to the court by virtue of a contract between it and the government, and institutes its own limitations periods on claims submitted to the CO and to this court. *Id.* ("[T]he CDA substantially restricted this court's jurisdiction over the category of contract cases to which the CDA applies, because *in addition to* meeting this court's Tucker Act jurisdictional limitations, a plaintiff with such a claim must *also* clear the jurisdictional hurdles of the CDA ....") (emphasis in original); *Gordon,* 227 Ct.Cl. at 338, 649 F.2d 837.

The Federal Circuit's holding in *Dalton v. Sherwood Van Lines, Inc.,* 50 F.3d 1014 (Fed.Cir.1995), on the other hand, does provide clear guidance concerning the applicability of either the ICA or the CDA to certain contractual relations involving transportation services for the government. In that case, a carrier transported household goods for the government over an extended period, but the contractual obligations between the parties emanated solely from GBLs. The carrier asserted that the CDA applied to the GBLs, while the government claimed the ICA controlled in the case. The Federal Circuit stated that because of the divergent administrative schemes of the two statutes, only one could apply to the GBLs at issue. *Dalton,* 50 F.3d at 1017–18. It explained as well that a claimant does not have discretion to choose which scheme it wishes to have applied to its case, nor may it switch from one scheme to the other when it does not receive the remedy it seeks. *Id.* at 1017. The Federal Circuit based its decision on two principles of statutory construction: (1) "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum," *id.* at 1018 (quoting *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976)) (internal quotations

omitted); and (2) "[i]mplied repeals are strongly disfavored, particularly 'when we are urged to find that a specific statute has been repealed by a more general one.'" *Dalton,* 50 F.3d at 1018. Applying these principles to the case before it, the Federal Circuit explained that the CDA had been enacted in 1978, three years after the specific administrative review scheme of the ICA, codified at 31 U.S.C. § 3726, was put in place. In finding the ICA to control in that case, the Federal Circuit stated that the CDA's general jurisdiction over government contracts did not trump or repeal the specific, narrow application of the ICA to cases dealing with transportation services. *Id.* at 1017–18.

Important to the case presently before the court, however, the Federal Circuit purposefully limited the scope of its decision to cases with similar contractual facts:

> Our decision is a narrow one, limited to cases in which the government obtains transportation services from a common carrier pursuant to [the ICA] and in which the GBL constitutes the contract between the parties. We do not address cases in which transportation services are obtained through other means, such as contracts for continuing transportation services over a period of time. In cases of that kind, the GBL does not constitute the contract between the carrier and the government agency, but is simply the means by which the agency exercises its right to procure services under a binding, long-term contract. A different analysis may be appropriate with regard to contract-based claims arising in that setting.

*Dalton,* 50 F.3d at 1020–21 (citing *A–Transport II,* 36 F.3d 1576) (internal citations omitted). This court must now determine whether such a "different analysis" is warranted in this case, because "services ... obtained through other means ...," i.e., tender agreements, are involved.

Although technically dicta, the assertion that a "GBL does not constitute the contract between the carrier and the government agency" when tender agreements are utilized impliedly calls into question a Court of Fed-

eral Claims case that *Dalton* cited favorably. In *Northeastern Pennsylvania Shippers Cooperative Ass'n, Inc. v. United States*, 32 Fed.Cl. 72, *cited in Dalton*, 50 F.3d at 1018, the court dealt with the parties' dueling arguments concerning the application of either the CDA or the ICA with regard to a contract that included a tender agreement and multiple GBLs. Though the parties arguably did not enter into the tender agreement in question pursuant to the ICA, the court held that the ICA applied, *Northeastern Penn.*, 32 Fed.Cl. at 75 n. 8, because that statute's stated purpose was specifically to apply to all claims against the government that involved transportation services:

> The Supreme Court has repeatedly found that a statutory remedy is preempted where a more detailed and precisely drawn statute provides a different remedy. In this case, the Contact Disputes Act provides for administrative review of disputes arising from "express or implied contract[s] ... entered into by an executive agency." 41 U.S.C. § 602(a). The act applies generally to all government contracts; it does not differentiate by type. Section 3726 and its implementing regulations, however, applies [sic] specifically to "claims against the United States relating to freight and passenger transportation services." Furthermore, the act provides its own mechanism for review of such claims that is notably different than that provided in the CDA. Accordingly, this court can not grant relief under the CDA in this case.

*Id.* at 75 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 489, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 834, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (internal citations omitted)). *Dalton* undermines this conclusion, specifically refusing to rule out the possibility that the CDA may be applied to certain transportation contracts. 50 F.3d at 1020–21.

A decision by one of the Boards of Contract Appeals, although not binding on this court, *see Mega Constr. Co. v. United States*, 29 Fed.Cl. 396, 467 (1993), persuasively brings *Dalton* into line with *Northeastern Penn.* In *Stapp Towing Co.*, 96–2 B.C.A. (CCH) ¶ 28,293 (A.S.B.C.A. Apr. 22, 1996), the Armed Services Board of Contract Appeals (ASBCA) applied the holding in *Dalton* to a transportation services dispute that involved tender agreements as well as GBLs. Despite the fact that *Dalton* had purposely limited its decision to cases involving only GBLs, ASBCA used the case to support its finding that the ICA and not the CDA applied to the tender agreement/GBL transportation contract at issue. *Stapp*, 96–2 B.C.A. (CCH) at 141,240. ASBCA relied on the same reasoning that the Federal Circuit utilized in *Dalton*, refusing to eviscerate the established application of the ICA and its administrative procedures by the enactment of the more general CDA. *Id.* ASBCA then extended the holding in *Dalton* to transportation contracts with the government in general: "[W]e conclude the Congress did not intend the general provisions of the Contract Disputes Act to supplant the pre-existing system of administrative review specifically designed for transportation services subject to [31 U.S.C. § ] 3726." *Id.*[4] ASBCA stated that it was obvious that 31 U.S.C. § 3726 would apply to the case, because Congress had recodified and amended the section on numerous occasions after the enactment of the CDA, and that therefore no preemption or repeal of the ICA by the CDA could be found. *Id.* Included in ASBCA's analysis was the fact that both the form tender agreement and the form GBL used in the procurement of services mentioned specifically that the ICA, and its implementing regulations, applied to the services provided. *Id.*

For the court in this case to follow the holdings of *Northeastern Penn.* and *Stapp*, as well as to resolve the question included in

---

4. Indeed, if the Federal Circuit in *Dalton* meant to protect its previous holding in *A–Transport II* by leaving the possibility for the limitation of the application of the ICA to transportation contracts, it need not have done so. As explained above, *A–Transport II* holds only that a tender agreement standing alone constitutes a valid, enforceable contract, and that therefore this court has Tucker Act jurisdiction over such an agreement. The decision in *Dalton* would not have changed such a holding, as *Dalton* assumes Tucker Act jurisdiction, and moves immediately to the discussion of whether the ICA or the CDA applies within the jurisdiction of the Tucker Act.

the conclusion of *Dalton* by finding general preemption of the CDA in favor of the ICA, comports with the overarching scope and purpose of the ICA. Section 13501 of the ICA defines the general jurisdiction of STB and its Secretary over transportation contracts. The section states that STB's jurisdiction extends "over transportation by motor carrier and the procurement of that transportation" whenever such transportation is interstate or international in nature. 49 U.S.C. § 13501(1), (2). No limitation, therefore, exists to curtail the ICA's application to any contract for transportation services. In addition, the ICA's implementing regulations, 41 C.F.R. pt. 101–41, state that they were promulgated pursuant to the ICA, 31 U.S.C. § 3726; nowhere in the regulations is the CDA mentioned. Within the regulations, GBLs are the primary form of transportation contract contemplated, but tender agreements and other contracts are also specifically mentioned and regulated. *See, e.g.,* 41 C.F.R. § 101–41.314. Finally, well-established case law in the federal courts explains the recognized intent of Congress to give broad scope to the ICA. *See Trans–Allied Audit Co. v. Interstate Commerce Comm'n,* 33 F.3d 1024, 1027 (8th Cir.1994); *Northeastern Penn.,* 32 Fed.Cl. at 75; *Interstate Auto Shippers,* 214 F.Supp. at 476; *Interstate Commerce Comm'n v. Dudgeon,* 213 F.Supp. 710, 714 (S.D.Cal.1961) ("[T]he Interstate Commerce Act is a highly remedial statute, and its terms are broadly comprehensive enough to bring within them all of those who, no matter what form they use, are in substance engaged in the business of transportation of property on the public highways for hire ....").[5]

In the case presently before the court, it is clear that the procurement of the transportation services of plaintiff was undertaken pursuant to the ICA. The tender agreements specifically mention the ICA in the tender agreements: "[Plaintiff's representative is] authorized to and do hereby offer to the United states [sic] Government ..., pursuant to section 10721 of the Interstate Commerce Act, or other appropriate regulatory authority, the transportation services herein described ...." Section 13712 is the successor to the pertinent provisions of the former section 10721, and it specifically excludes transportation services from the general procurement provisions in title 41 of the U.S.Code, which contains the CDA. 49 U.S.C. § 13712 (Supp. I 1995). Because the parties did not rely on other "appropriate regulatory authority" for performance of the contracts, and due to the generally broad jurisdiction of the ICA over transportation services, it is clear that the tender agreements contemplate the application of the ICA. In addition, when a dispute arose, plaintiff attempted to settle with DOD and then with GSA through OTA. It then proceeded to GSBCA when it could not get satisfaction from GSA. Plaintiff therefore availed itself of the administrative procedures of the ICA, 31 U.S.C. § 3726, and may not now switch to the CDA's procedures simply because the CDA now suits plaintiff. *Dalton,* 50 F.3d at 1017. The court therefore finds that the ICA applies to plaintiff's claims to the exclusion of any CDA applicability.

**B. Statute of Limitations**

**1. "Payment"**

■ It is left for the court now to determine whether plaintiff has brought its claims within the specified limitations period prescribed by the ICA. Plaintiff and defendant are in dispute as to when such period begins, as well as whether the limitations period was tolled at any time, and as such have left the court with matters of statutory interpretation. Interpretation of a statute begins with the language of the statute. *Fanning v. West,* 160 F.3d 717, 721–22 (Fed.Cir.1998) (citing *Bailey v. United States,* 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)). The court must examine "its language to determine whether Congress has 'directly spoken to the precise question at issue.'" *Vesser v. Office of Pers. Mgmt.,* 29 F.3d 600, 604 (Fed.Cir.1994) (quoting *Chevron, USA, Inc. v. Nat'l Res. Def. Council, Inc.,* 467 U.S.

---

**5.** The ICA in fact makes clear that in some cases, it does not apply to transportation services. *See* 49 U.S.C. § 13506 (Supp. III 1997). In this case, however, no exemption applies to the services provided by plaintiff.

837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). "If the intent of Congress is clear, that is the end of the matter because [the court] must give effect to the unambiguously expressed intent of Congress." *Id.* The court must consider "not only the bare meaning of the word[s] but also [their] placement and purpose in the statutory scheme." *Bailey,* 516 U.S. at 145, 116 S.Ct. 501. Where the literal meaning of the statute produces an unreasonable result "plainly at variance with the policy of the legislation as a whole," the court will follow instead the purpose of the statute. *United States v. Am. Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) (internal quotations omitted). A statute must be interpreted as a whole, *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), and the court should construe the statute to give effect and meaning to all of its terms. *Sterling Fed. Sys., Inc. v. Goldin,* 16 F.3d 1177, 1185 (Fed.Cir.1994). Moreover, the court should attempt "not to interpret a provision such that it renders other provisions of the same statute inconsistent, meaningless, or superfluous." *Great N. Nekoosa Corp. v. United States,* 38 Fed.Cl. 645, 657 (1997).

Two provisions in the ICA concern the statute of limitations for claims by carriers against the government. First, 49 U.S.C. § 14705 (Supp. I 1995) sets up the limitations period for complaints made to STB or its Secretary, and actions at law brought in an appropriate court. The statute generally requires a "civil action" by or against a carrier to begin within 18 months of the accrual of the claim. § 14705(a). Accrual is defined as the point at which a shipment is delivered or tendered by the carrier. § 14705(g). When the transportation contract is between the government and a carrier, however, subsection (a) does not apply, giving way instead to subsection (f), entitled "Government transportation." Under this subsection, the limitations period is set at three years from the later date of "(1) payment of the rate for the transportation or service involved; (2) subse-

quent refund for overpayment of that rate; or (3) deduction made under section 3726 of title 31." § 14705(f).

Next, 31 U.S.C. § 3726 provides the statute of limitations for administrative claims submitted to GSA pursuant to the ICA. The section provides that a bill or claim for payment of transportation services should generally be sent directly to the agency that procured the services. § 3726(a)(1). If a claim cannot be resolved by the agency, GSA will resolve the claim. § 3726(c)(1). Such a claim must be received by GSA within three years from the latest date of the following: "(A) The date of accrual of the claim. (B) The date payment for the transportation is made. (C) The date a refund for an overpayment for the transportation is made. (D) The date a deduction under subsection (d) of this section is made." § 3726(c)(2). Appeal of a GSA decision under section 3726 may be made to GSBCA within six months of a final action taken by GSA or the three-year limitations period, whichever is later. § 3726(i)(1); *see* 41 C.F.R. § 101–41.701; 48 C.F.R. § 6103.1(a) (2000).[6]

Plaintiff delivered shipments pursuant to the contracts from October 1, 1994, to September 30, 1997, and defendant made initial payments for the shipments within a few weeks of each delivery. The three-year statute of limitations located in both section 3726(c)(2)(B) and section 14705(f)(1) began to run at the time of each payment. Plaintiff had a choice to proceed with its claims to GSA and then to GSBCA pursuant to section 3726, or to bring an action directly to this court, in accordance with section 14705. Plaintiff chose the former, and GSA took its final action on August 8, 1999. Only after this decision did plaintiff finally proceed to file its claims in this court. As plaintiff brought its action on July 26, 2000, any claims based on payment made before July 26, 1997, are time-barred under the ICA. *See Scott v. United States,* 27 Fed.Cl. 829,

---

**6.** The Code of Federal Regulations states that a carrier may appeal from a GSA decision concerning transportation services to the Comptroller General, in the General Accounting Office (GAO). 41 C.F.R. § 101–41.701(a). The GAO, however, has delegated this review power to GSBCA. *See Inter–Coastal Xpress, Inc.,* 99–1 B.C.A. (CCH) at 150, 147–48 n. 3, 1999 WL 160018.

831 (1993) (citing *True Transport, Inc. v. United States*, 224 Ct.Cl. 703, 705 (1980)).

Plaintiff argues that "payment" under section 14705 occurred in this particular case not at the time plaintiff received its routine payments under the tender agreements and GBLs, but on August 8, 1999, when GSA denied most of its claims in Settlement Certificates pursuant to regulation. *See* 41 C.F.R. § 101–41.605–3. Plaintiff therefore asserts that it has brought its claims well within the three-year limitations period denoted in section 14705. Defendant refutes this interpretation, stating that "payment" means the routine payments for transportation services that occur in the course of performance of contracts. Section 14705 does not contain a definition of "payment."

The pertinent case law has never treated "payment" as anything other than the initial payment of the rate for transportation services under the normal operation of a contract. *See True Transport*, 224 Ct.Cl. at 705; *Scott*, 27 Fed.Cl. at 831. In each case, "payment" has been held to occur at the end of a normal process of performance: a GBL for a specific delivery is executed, that delivery is made, and the money is paid soon thereafter. In other words, "payment" in the case law is regarded as the basis for dispute, not the resolution of an earlier dispute via supplemental payment. When there is an allegedly insufficient payment, therefore, a carrier makes a claim; any settlement under that claim is not considered a new "payment." Indeed, if this definition of "payment" is accepted, the limitations period could be renewed whenever the government attempts to settle a carrier's claim by means of the payment of money. It is foreseeable that, under plaintiff's interpretation, even a payment by the government to satisfy a judgment of this court could be considered the new trigger for the three-year statute of limitations under section 14705. This tortured definition of "payment" will not be embraced by the court. Through an analysis of the pertinent language of sections 14705 and 3726, it is clear that the events triggering the statute of limitations in section 3726 are the same as those in section 14705. *See* 31 U.S.C. § 3726(c)(2)(B)–(D); 49 U.S.C. § 14705(f)(1)-

(3). If Congress had intended the limitations period in section 14705 to be triggered by the culmination of the administrative procedures and adjudication provided for in section 3726, such as the issuance of the Settlement Certificates involved in this case, it should have stated so specifically. Without such specificity, the court will rely on the common sense and plain meaning of "payment" for purposes of section 14705. *See Miller v. United States*, 209 Ct.Cl. 135, 142, 531 F.2d 510 (1976) ("Unless the context requires otherwise, words are construed according to their ordinary meaning in common speech . . . ."), *cited in Schiff v. United States*, 24 Cl.Ct. 249, 252 (1991).

Also, to accept plaintiff's argument that it had three years from the final action taken by GSA through its Settlement Certificates would be to frustrate the clear intent of Congress that transportation claims be resolved in a relatively short period of time. *See Bowman Transp., Inc. v. United States*, 220 Ct.Cl. 36, 40, 597 F.2d 254 (1979); S. REP. NO. 99–120 (1985), *reprinted in* 1986 U.S.C.C.A.N. 5028, 5044 (emphasizing the need to maintain limits on the time period for filing transportation claims in the courts); *see also Gordon*, 227 Ct.Cl. at 343, 649 F.2d 837 (Friedman, J., concurring) (explaining that a conflict between two limitations periods located in respective statutes must be resolved in favor of what the court determines would have been Congress' decision if presented with the conflicting limitations periods). Under plaintiff's interpretation, a claimant would have three years from initial "payment" under section 3726 to make a claim before GSA, and then could wait for a final action from GSA. This final action would constitute a second "payment," this time for the purposes of section 14705. After the date of the GSA final action, a carrier would have three additional years to bring suit in this court. This would make the effective limitations period of the ICA as long or longer than the limitations periods of the CDA, 41 U.S.C. §§ 605(a), (c)(2), 609(a)(3), and this court's general limitations statute, 28 U.S.C. § 2501 (1994). The ICA certainly does not contemplate this sort of elongated process of claim resolution. For these reasons, with regard to each individual claim,

plaintiff had three years from the date of initial payment to bring suit in this court.

## 2. Tolling

Plaintiff contends lastly that the three-year limitations period in section 14705 was tolled during the pendency of plaintiff's claims before OTA. Plaintiff asserts that because the administrative remedy procedures located in section 3726 were "mandatory," plaintiff had to wait for final OTA action before proceeding to this court. Defendant replies that nowhere in the pertinent statutes or regulations is it mandated that a claimant exhaust administrative remedies before filing suit in this court, and therefore no tolling was effected in this case.

■ When administrative remedies are deemed to be permissive and not mandatory, seeking recourse to such remedies does not toll the pertinent limitations period, as the remedies do not interfere with a claimant's ability to bring a timely claim. *Brighton Village Assocs. v. United States*, 31 Fed.Cl. 324, 332–33 (1994), *aff'd*, 52 F.3d 1056, 1060 (Fed.Cir.1995) (citing *Hurick v. Lehman*, 782 F.2d 984, 987 (Fed.Cir.1986)). The administrative procedures in section 3726 have not been held by this court or the Federal Circuit to be mandatory. *See Dalton*, 50 F.3d at 1017; *True Transport*, 224 Ct.Cl. at 705; *Iran Nat'l Airlines Corp. v. United States*, 175 Ct.Cl. 504, 508, 360 F.2d 640 (1966). Neither section 3726 nor section 14705 contains language that requires a claimant to exhaust its administrative remedies before bringing claims to this court or the district court. *Dalton*, 50 F.3d at 1020.

■ *Dalton* and the other cases cited above may seem limited in their usefulness, because they held specifically that a carrier did not have to make a discretionary claim to GAO (now GSBCA) before bringing an action at law. *See id.*; 41 C.F.R. § 101–41.701; 31

U.S.C. § 3726. It is readily apparent, however, that a carrier need not exhaust its discretionary remedy before GSA either. Although the pertinent regulations do in fact state that claims must go to either GSA or the procuring agency within the three-year statute of limitations, 41 C.F.R. §§ 101–41.602(b), 101–41.603–4(a), this mandate nonetheless applies only when a claimant has first chosen to take the administrative route to adjudication instead of directly through this court. As it is with the ICA itself, nowhere in the ICA's implementing regulations is it mandated that a claim go first to GSA or the pertinent agency before a carrier may proceed to this court. Plaintiff had three years from the date of initial payment on each shipment to bring suit in this court, whether it chose other avenues for remedy or not. The limitations period in section 14705, therefore, was not tolled during the time that plaintiff's claims were before GSA and GSBCA.[7]

## II. *Motion to Amend Complaint*

■ Plaintiff has brought a motion to amend its complaint to include other causes of action, if defendant's motion to dismiss is allowed. The court can discern two additional causes of action: (1) that this court has jurisdiction pursuant to the general provisions of the Tucker Act, 28 U.S.C. § 1491; and (2) that plaintiff has a due process right of review of agency action. Taking the second part first, due process claims are beyond the court's subject matter jurisdiction. *See* 28 U.S.C. § 1491(a)(1); *Murray v. United States*, 817 F.2d 1580, 1582–83 (Fed.Cir. 1987), *cert. denied*, 489 U.S. 1055, 109 S.Ct. 1318, 103 L.Ed.2d 587 (1989) (holding that due process claims do not require the payment of money damages and are, therefore, not within the court's jurisdiction). Next, the Tucker Act does provide the jurisdiction-

7. In this case, plaintiff may have believed erroneously that it was indeed mandatory to receive the Settlement Certificates before proceeding to this court due to GSBCA's holding in *Inter–Coastal Xpress*. In that decision, GSBCA dismissed the majority of plaintiff's claims as premature, stating that it could not make a decision without a final determination from OTA on the claims. 99–1 B.C.A. (CCH) at 150,144. Yet, while

GSBCA is explicitly enjoined from making decisions on carrier claims before the final determination of GSA (via OTA or otherwise), 41 C.F.R. § 101–41.701, no such limitation is placed upon this court's jurisdiction. The lack of a similarly specific limitation on suits brought in this court makes it all the more clear that recourse to the court was available to plaintiff from the time of initial payment.

al basis for claims against the government based on contract. 28 U.S.C. § 1491(a)(1). Nevertheless, the court has held that when another statute provides substantive jurisdiction in this court and such statute contains its own specific statute of limitations, the specific limitations period of that statute will control over the general six-year limitations period contained in 28 U.S.C. § 2501. *See Bath Iron Works Corp. v. United States,* 27 Fed.Cl. 114, 124 (1992), *aff'd,* 20 F.3d 1567 (Fed.Cir.1994); *Gordon v. United States,* 227 Ct.Cl. at 338, 649 F.2d 837. In this case, the ICA applies to the tender agreements and GBLs at issue, and therefore the ICA's statute of limitations controls. Because plaintiff has failed to comply with this limitations period, the court lacks jurisdiction over the claims. If the court were to allow the additional causes of action to be added to the complaint, therefore, it would not aid the plaintiff in keeping its claims before this court.

The court will allow plaintiff to amend its complaint, however, by supplementing its allegations of jurisdictional facts, which are deficient at this time. As was mentioned above, approximately 170 of plaintiff's claims do not have a date of initial payment. Plaintiff states that it cannot locate the checks corresponding to certain shipments and therefore payment dates cannot be provided. It alleges that its requests to defendant to provide information on the payment of these 170 claims have not been met with cooperation. Plaintiff asserts that the question of dates of initial payment is a factual dispute, that discovery in the case is necessary, and that this dispute and need for discovery prevent the court from granting defendant's motion to dismiss.[8] Defendant counters that it is plaintiff's burden to prove facts that demonstrate the court's jurisdiction over the claims in this case, and that plaintiff has failed to do so.

Both parties misstate the law on this issue. The standard for a motion to dismiss has been explained above. Plaintiff must merely *allege* sufficient jurisdictional facts for the court to find jurisdiction. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. If, and only if, defen-

dant challenges those allegations of fact, the court will ask plaintiff to provide evidence of its original factual allegations. *Rocovich,* 933 F.2d at 994. No discovery is necessary, therefore, until (1) plaintiff has alleged sufficient jurisdictional facts, and (2) defendant has, in turn, disputed those facts. Neither has occurred in this case. It is assumed that plaintiff will wish to take the first step, by supplementing its allegations of jurisdictional facts in accordance with this decision. The court will welcome such supplementation as a matter of fairness, in order to allow plaintiff to fully present its case. *Cf. Thoen v. United States,* 765 F.2d 1110, 1115 (Fed.Cir.1985).

### *Conclusion*

For the above-stated reasons, the ICA's broad scope covers the contracts involved in this case to the exclusion of CDA applicability. The limitations period for bringing actions at law under section 14705 of the ICA is three years from the date of each initial payment made by the government to a carrier. Defendant's motion is hereby ALLOWED in part and DENIED in part. As plaintiff filed its complaint on July 26, 2000, plaintiff's claims based on initial payments made before July 26, 1997, are time-barred pursuant to 49 U.S.C. § 14705. These claims are hereby dismissed. The remaining claims based on payments made on or after July 26, 1997, are within the court's jurisdiction. The parties shall file a joint status report on or before July 12, 2001, concerning further proceedings on these claims. In addition, plaintiff's motion to amend its complaint is ALLOWED in part, limited to supplementation of jurisdictional facts in the form of dates of initial payment on its approximately 170 deficient claims. Plaintiff shall have until July 12, 2001, to amend its complaint in this manner. Should plaintiff fail to provide the supplemental jurisdictional facts within the time allowed, the Clerk shall dismiss the deficient claims without further order of the court.

IT IS SO ORDERED.

---

8. *See* Transcript of Oral Argument held May 22, 2001, at 25.