**INTER–COASTAL XPRESS, INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 02–5001.**

United States Court of Appeals, Federal Circuit.

DECIDED: July 19, 2002.

Leo S. Fisher, Bean, Kinney & Korman, P.C., of Arlington, VA, argued for plaintiff-appellant.

Matthew P. Reed, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; Robert E. Kirschman, Assistant Director; and Bryant S. Banes, Attorney. Of counsel was Elizabeth G. Candler.

Before MICHEL, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and RADER, Circuit Judge.

Opinion for the court filed by Circuit Judge MICHEL. Dissenting opinion filed by Senior Circuit Judge FRIEDMAN.

MICHEL, Circuit Judge.

Plaintiff Inter–Coastal Xpress, Inc. appeals from a judgment by the United States Court of Federal Claims holding that, as applied to Inter–Coastal's 2410 "holdover" claims against the United States Government, the Interstate Commerce Act's three-year filing period barred 2171 of those claims as untimely. *Inter–Coastal Xpress, Inc. v. United States*, 49 Fed.Cl. 531 (2001). "Holdover" charges or claims refer to the payments allegedly owed by the government for ordering a common carrier to pick up a shipment one day but not deliver it until the next, *i.e.*, to "holdover" the shipment until the following day. Inter–Coastal asserts that the government owes it more than $594,100 in holdover payments and interest arising from the parties' three-year "tender" contracts for transportation services. Further, it argues that the trial court erred by applying the limitations period contained in the Interstate Commerce Act (ICA) instead of the Contract Disputes Act (CDA), the latter of which would have purportedly made all of Inter–Coastal's holdover claims timely and therefore within the Court of Federal Claims' jurisdiction. Because we conclude that the ICA limitations period governs all actions seeking payment of the "charges" owed on a common carrier agreement for "transportation services"

with the government and because "payment" under that statute—one of the acts that triggers the limitations period—occurs once the government purports to pay all that it owes under its transportation-services agreement, we uphold the trial court's decision to dismiss the holdover claims as untimely.

## I

In April 1994, the Defense Logistics Agency (DLA) sent letters to various common carriers, including Plaintiff Inter-Coastal, soliciting them to submit "tender" offers or bids on providing transportation services for the Department of Defense for a three-year period. These letters included copies of a form tender offer, which the carrier had to fill out, sign and re-submit as its offer or tender.

In its submitted Tender, Inter-Coastal offered to regularly load and deliver shipments of "perishable subsistence" for at least three locales: "DSO [Defense Subsistence Office] New Orleans"; "DSO San Antonio"; and "DSO Fort Worth." Three pages of its Tender (*i.e.*, its written offer) at least arguably indicate that, for most of its deliveries, Inter-Coastal would accept a set rate for loading a shipment one day and then not delivering it until the next. (*See* J.A. 111a—113a.) For other deliveries, however, Inter Coastal indicated that it would accept a set rate for loading and delivering a shipment on the same day. (*See id.*) For shipments that Inter-Coastal agreed to pick up and deliver on the same day, but which the government unexpectedly caused Inter-Coastal to "holdover" or not deliver until the following day (or the first business day following a weekend or holiday), the Tender indicated that Inter-Coastal would charge a "holdover" payment. (*See* J.A. 114a.) These hold-

over charges ranged from $400 for a weekend to $250 for a weeknight (Monday through Thursday).

The Tender also noted that, in holdover situations, the government would have the Government Bill of Lading—the document that ordinarily identifies the cargo being shipped as well as other applicable shipment terms—"annotated" so as to reflect the government's approval of the charge. The parties clarified at oral argument that, as a matter of law, the government must provide a bill of lading (GBL) at the beginning of each shipment by a common carrier. Further, counsel for the government stated that, in most instances, the terms from both a tender agreement and a GBL constitute the "contract" between the government and a common carrier for any one delivery.

In any event, the government in this case accepted Inter Coastal's tender offer for three years, for shipments beginning in October 1994 and ending in September 1997. The parties agree that this resulted in the formation of three separate tender agreements, one for each of the three locations (Fort Worth, San Antonio, New Orleans) that Inter-Coastal would service. By the signature of its general manager, Inter-Coastal also certified for each of these agreements that it was providing transportation services "pursuant to Section 10721 of the Interstate Commerce Act, or other appropriate regulatory authority." (J.A. 87a, 116a, 143a.) Section 10721 of the ICA, now re-codified at 49 U.S.C. § 13712, generally exempts transportation-services agreements from the procurement procedures that ordinarily apply to other government contracts.

Inter-Coastal thereafter began to perform its transportation-services contracts, making thousands of government ship-

ments during the three-year period covered by the tender agreements. The parties have stipulated that, throughout this period, Inter–Coastal had in most instances submitted a payment charge shortly after each shipment and the government had paid that charge a few days later. (*See* J.A. 146a, 164a–200a.) In 1995, however, a dispute arose about when the government did and did not owe holdover charges, in addition to the standard delivery rate it indisputably owed and was in fact paying. Specifically, Inter–Coastal noted that in addition to its standard "line-haul" charges for delivering a shipment, it also had submitted holdover charges for deliveries made the day after it had picked up shipments for the Forth Worth and San Antonio locations; but that, for most of these shipments, the government had thereafter refused to pay a holdover charge. By contrast, the DSO New Orleans had apparently made holdover payments in the exact same situation.

After Inter–Coastal and various government offices (*e.g.,* DLA) exchanged letters about the matter, the government took the position that because the parties' tender agreements had in most cases specified that a single charge applied to the shipments that Inter–Coastal had to pick up one day and deliver the next, Inter–Coastal alone bore the responsibility for having failed to incorporate or "work" a holdover charge into its standard freight rate. In other words, in the government's view, Inter–Coastal could collect holdover payments for *unscheduled* holdovers only, not scheduled holdovers. Consistent with this understanding, the government did agree to pay holdover charges for those situations where the tender agreement specified a same-day pick-up and delivery but Inter–Coastal was nevertheless held over until the following day.

## A

Dissatisfied with this analysis, Inter–Coastal continued to request relief from the various government agencies involved. In May 1996, after further investigation, the Department of the Army concluded that the government—via DSO New Orleans—had actually overpaid Inter–Coastal more than $6,500 in holdover payments. As a result, the Army's "Contracting Officer" requested assistance from the General Services Administration (GSA) for collecting on this amount. (*See* J.A. 35a–36a.)

In November 1996, while still performing under the tender agreements, Inter–Coastal availed itself of the administrative dispute resolution procedures established by the Transportation Act, *see* 31 U.S.C. §§ 3726(c)(1) and (2), submitting more than 2400 "holdover" claims to the GSA's Office of Transportation Audits. The Transportation Act's administrative procedures allow a common carrier embroiled in a contract dispute with the government to file and have its claim resolved directly by GSA itself. *See id.* If a carrier disagrees with GSA's findings, it may appeal to the GSA's Board of Contract Appeals or request further review by the Comptroller General. 31 U.S.C. § 3726(i)(1); *see also* 41 C.F.R. § 101–41.603–4 (establishing procedures for having disputed charges appealed to the Comptroller General).

The Transportation Act is part of the Interstate Commerce Act, a statute enacted in 1887 with the goal of eliminating discrimination in the provisioning of interstate transportation services. *See generally Tri–State Motor Transit Co. v. United States,* 39 Fed.Cl. 485, 488 (1997) (discussing the purpose of the ICA as well as the numerous amendments thereto, including the amendments made by the Transportation Acts of 1920, 1940 and 1958). The

ICA also provides for a federal "civil action to recover charges for transportation or service provided by [a common] carrier," 49 U.S.C. § 14705(a), including "transportation for the United States Government," 49 U.S.C. § 14705(f). Instead of pursuing an administrative claim with GSA, then, a carrier may sue the government in federal court; but it "must begin [that] civil action," 49 U.S.C. § 14705(a), within three years "from the later of the date of—(1) payment of the rate for transportation or service involved." 49 U.S.C. § 14705(f)(1); see also 49 U.S.C. §§ 14705(f)(2)-(3) (setting forth other applicable dates not at issue in this case). In this appeal, the parties do not assert that a carrier must exhaust the Transportation Act's (i.e., the ICA's) administrative process before suing in federal court under Section 14705.

In September 1997 and again in November 1997, GSA denied two of Inter–Coastal's 2400-plus holdover claims on the merits but left the remaining claims unresolved. Inter–Coastal then submitted all its holdover claims to the GSA Board of Contract Appeals. In March 1999, the Board reviewed and upheld the denial of the two holdover claims; but it dismissed the other claims as prematurely filed. Neither the record nor the parties' briefing explains the reasons for either GSA's or the Board's decision. In any case, on August 8, 1999, the Department of Defense, the agency that had formed the tender agreements with Inter–Coastal, issued 2308 "Settlement Certificates," each of which simply cited the Board's decision and tersely denied a corresponding "holdover" claim.

**B**

On July 26, 2000, Inter–Coastal sued the government as well as the individual agencies involved (the DOD, the DLA and the Military Traffic Management Command) for breach of contract, citing the Contract Disputes Act, 41 U.S.C. §§ 602(a)(2), 609(a)(1), as the jurisdictional basis for bringing suit in the Court of Federal Claims. (See J.A. 38a–40a.) Unlike the ICA, the CDA vests the Court of Federal Claims with jurisdiction over a breach-of-contract claim against the government if the claimant first submits a written claim to the applicable government contracting officer and then files its complaint with the Court of Federal Claims "within twelve months" after receiving the contracting officer's decision. 41 U.S.C. § 609(a)(3). At the time when Inter–Coastal filed its complaint, the parties agreed that out of the 2410 instances in which the government had allegedly failed to pay holdover charges, Inter–Coastal had received "payments" of some sort for 2171 of them before July 26, 1997—in other words, beyond the three-year filing period established by the ICA.

Among other things, Inter–Coastal's complaint asserts that the government erroneously interpreted the parties' tender agreements to mean that Inter–Coastal should have incorporated its holdover charge into its freight rates. According to Inter Coastal, the plain meaning of the parties' 1994 agreements simply required a bidder to provide a separate figure for its holdover charges. (See, e.g., J.A. 44a, Compl. ¶¶ 17–18.) The government countered by moving to dismiss, arguing that the ICA—not the CDA—governs the parties' contracts and that, consequently, the ICA's three-year limitations period had run on 2171 of the 2410 holdover claims. Thus, went the argument, the Court of Federal Claims lacked jurisdiction to adjudicate these claims. Inter–Coastal opposed the motion and in addition sought leave to amend its complaint.

The Court of Federal Claims partially granted the government's motion to dismiss the 2171 holdover claims for lack of jurisdiction. In so doing, the court thoroughly analyzed and acknowledged that it was answering the question left unanswered by our court's decision in *Dalton v. Sherwood Van Lines,* 50 F.3d 1014 (Fed. Cir.1995).

### Dalton v. Sherwood Van Lines, 50 F.3d 1014 (Fed.Cir.1995)

In *Dalton,* we held that the CDA did not apply to a contract for transportation services with the government when the parties' contract consisted *solely* of a *Government Bill of Lading,* the written instrument the government ordinarily issues to have freight transported and to set forth the terms of that transportation agreement. *See* 50 F.3d at 1015. Citing the bedrock principle of statutory construction that the more specific statute will trump the more general, we reasoned that Congress did not intend to have the general provisions of the later-enacted CDA supplant the earlier, transportation-specific provisions of the Transportation Act. *Id.* at 1018. To bolster this analysis, we noted that Congress had repeatedly recodified and amended the Transportation Act since the CDA's passage, meaning the CDA did not impliedly repeal the Transportation Act's "existing system of administrative review" either. *Id.*

Also, we said, the "practice in the industry" showed that the CDA and its procedures for adjudicating contract disputes had not displaced the Transportation Act's older, more-specific procedures for addressing disputes over transportation charges, as private carriers still routinely invoked these procedures for transactions involving a Government Bill of Lading.

*Id.* at 1019. And GBL-based transactions with government agencies, unlike typical federal procurement contracts, constitute " 'spot movements'—one-time arrangements for the movement of property from one place to another." *Id.* Thus, given the simplicity of these "unusually small" GBL-based contracts, we determined that the administrative procedures of the Transportation Act could better address disputes arising under these agreements than could the CDA, regardless of whether the dispute involved overcharges or property damage. *Id.*

Last, we added in *Dalton* that the Federal Acquisition Regulations expressly exempted transportation services obtained under a GBL from the Contract Disputes Act. 50 F.3d at 1019. On top of that, we reasoned, unlike the CDA and its provisions that require or otherwise involve a government contracting officer, one could not easily identify a contracting officer for small, GBL-based agreements. *Id.* Finally, the GBL signed by the parties in *Dalton* indicated that the Transportation Act—not the CDA—would govern the parties' agreement. *Id.* Before concluding, however, we noted that our analysis might differ if the agreements at issue involved "contracts for continuing transportation services over a period of time":

> Our decision is a narrow one, limited to cases in which the government obtains transportation services from a common carrier pursuant to 49 U.S.C. § 10721 and in which the GBL constitutes the contract between the parties. *We do not address cases in which transportation services are obtained through other means, such as contracts for continuing transportation services over a period of time. See, e.g., A–Transport Northwest Co. v. United States,* 36 F.3d 1576 (Fed.

Cir.1994) (tender agreement for transportation services over a 24–month period constituted the contract between the parties); *Matter of Federal Transport, Inc.—Request for Reconsideration*, 68 Comp. Gen. at 452 (selection of a carrier under guaranteed traffic program created a requirements contract with carrier). *In cases of that kind, the GBL does not constitute the contract between the carrier and the government agency, but is simply the means by which the agency exercises its right to procure services under a binding, long-term contract. A different analysis may be appropriate with regard to contract-based claims arising in that setting.*

*Id.* at 1020–21 (emphases added).

**The Court of Federal Claims' Decision**

Going beyond the *Dalton dicta,* the Court of Federal Claims concluded that, notwithstanding that the transportation-service agreements in this case spanned a three-year period, a finding that the ICA governed the hybrid tender-GBL contracts here would comport with Congress' goal of having that statute govern interstate transportation contracts. *Inter–Coastal Xpress,* 49 Fed. Cl. at 539. Indeed, the court declared that "well-established case law" has identified the "recognized intent of Congress to give broad scope to the ICA." *Id.* (citing *Trans–Allied Audit Co. v. Interstate Commerce Comm'n,* 33 F.3d 1024, 1027 (8th Cir.1994)); *Northeastern Penn. Shippers Co-op. Ass'n v. United States,* 32 Fed.Cl. 72, 75 (1994); *Interstate Commerce Comm'n v. Interstate Auto Shippers, Inc.,* 214 F.Supp. 473, 476 (S.D.N.Y.1963); *Interstate Commerce Comm'n v. Dudgeon,* 213 F.Supp. 710, 714 (S.D.Cal.1961) ("[T]he Interstate Commerce Act is a highly remedial statute, and its terms are *broadly comprehensive enough to bring within them all of those who, no matter what form they use, are in substance engaged in the business of transportation of property* on the public highways for hire . . . ." (emphasis added)).

Persuasively, the court also reasoned that the tender agreements here specifically mentioned the ICA and the relevant provision of the ICA (49 U.S.C. § 13712) that exempts transportation services from the general procurement provisions of Title 41 of the U.S.Code, the same title that houses the CDA. *Inter–Coastal Xpress,* 49 Fed.Cl. at 539 (" '[Plaintiff's representative is] authorized to and do[es] hereby offer to the United states [sic] Government . . ., pursuant to section 10721 of the Interstate Commerce Act, or other appropriate regulatory authority, the transportation services herein described. . . .' Section 13712 [of the ICA] is the successor to the pertinent provisions of the former section 10721, and it specifically excludes transportation services from the general procurement provisions in title 41 of the U.S.Code, which contains the CDA.").

Last, as the court noted, Inter–Coastal had a choice to pursue its claims for "holdover payments" either by using the GSA administrative route or by filing a complaint in federal court. *Id.* at 540 (citing 31 U.S.C. § 3726 and 49 U.S.C. § 14705(f)(1)). As explained by the court, Inter–Coastal simply chose to avail itself of the former, filing claims with GSA in 1997 alleging that the contracting agency (the Department of Defense) had failed to pay "holdover" charges more than 2400 times during the course of their three-year contract. *Id.* at 534, 540. Only after the administrative dispute-resolution process had ended and the government issued Settlement Certificates, on August 8, 1999, did

Inter–Coastal finally sue the government in the Court of Federal Claims, on July 26, 2000—more than three years after the government had otherwise made "payment" on 2171 of the shipments that gave rise to the holdover claims. *Id.* Consequently, according to the Court of Federal Claims, Inter–Coastal had simply missed the three-year filing period for most (but not all) of its holdover claims, thereby divesting the court of jurisdiction over them.

Of the 239 holdover claims for which Inter–Coastal had alleged no jurisdictional facts, the Court of Federal Claims did grant leave to file an amended complaint. At the same time, however, while also denying Inter–Coastal's equitable-tolling argument (an argument not renewed on appeal), the court entered partial judgment on the dismissed claims under RCFC 54(b). This appeal followed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

#### C

On appeal, the parties present two primary issues for our review. First, we must decide whether the ICA, as opposed to the Contract Disputes Act, governs Inter–Coastal's action to recover the money allegedly owed on the parties' contract for transportation services. Second, if the ICA does apply, we must decide whether "payment," as used in 49 U.S.C. § 14705(f)(1), refers to the payment made by the government on a completed delivery or whether it instead refers to the time when the administrative dispute process has ended and the government finally declares that it will not make a certain payment, *i.e.*, that it will "pay nothing" on a certain claim. The latter issue is significant because, more than three years before the filing of Inter–Coastal's complaint,

the government did pay the set rate for the 2171 shipments for which it also allegedly owes a holdover charge. By contrast, if "payment" did not occur until August 8, 1999, when the government via the Department of Defense had issued Settlement Certificates denying Inter–Coastal's holdover claims, many of those holdover claims would have satisfied the three-year filing deadline.

As more fully discussed below, we hold that, per the plain meaning of the statute, the ICA limitations period governs disputes about the "charges" or payments of money owed on government contracts for transportation services. Further, we hold that, in this ICA context, "payment" occurs when the government pays all that it believes it owes on a shipment during the ordinary course of contract performance.

#### II

We review *de novo* the Court of Federal Claims' decision to grant a motion to dismiss for lack of jurisdiction. *Tippett v. United States,* 185 F.3d 1250, 1254 (Fed. Cir.1999). Although characterized as a statute of limitations, the filing periods established by the ICA and the CDA are both " 'jurisdictional in nature,' " *see Bath Iron Works Corp. v. United States,* 20 F.3d 1567, 1572 (Fed.Cir.1994) (quoting *Hart v. United States,* 910 F.2d 815, 818–19 (Fed.Cir.1990)), for both operate as limits on the waiver of sovereign immunity by the Tucker Act, which otherwise entitles a contractor to sue the government in the Court of Federal Claims. Further, because we must narrowly construe such waivers of immunity, and because Congress has vested the Court of Federal Claims with only limited jurisdiction, "jurisdiction [in that court] depends upon the extent to which the United States has

waived its sovereign immunity." *Myers v. United States,* 50 Fed.Cl. 674, 682 (2001); *accord Jones v. United States,* 801 F.2d 1334, 1335 (Fed.Cir.1986) ("Compliance with the Claims Court's statute of limitations is jurisdictional."); *Coon v. United States,* 30 Fed.Cl. 531, 534 (1994) ("Compliance with the statute of limitations, in [the Court of Federal Claims], is an explicit jurisdictional prerequisite for the commencement of suit."). Reviewing the trial court's decision without deference, we agree that the ICA applies to the tender agreements here and that it thus precludes most of Inter Coastal's holdover claims for want of jurisdiction.

## A

■ In fact, we agree that Congress intended to have the ICA govern all actions seeking the payment of money for the charges owed on contracts for transportation services between common carriers and the government. As the Court of Federal Claims emphasized and our court has repeatedly stated, "[i]t is a 'basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum,' ... unless the later statute 'expressly contradict[s] the original act or unless such a construction is absolutely necessary ... in order that the words of the later statute shall have any meaning at all.'" *Dalton v. Sherwood Van Lines,* 50 F.3d at 1018 (quoting *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976) and *Traynor v. Turnage,* 485 U.S. 535, 548, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988)); *accord Todd v. Merit Sys. Prot. Bd.,* 55 F.3d 1574, 1578 (Fed.Cir.1995).

And here, the application of that principle means the specific provisions of the ICA trump the general provisions of the CDA and govern disputes concerning contracts for transportation services with the government. The relevant provisions of the ICA state:

> (a) In general.—A carrier providing transportation or service ... *must begin a civil action to recover charges* for transportation or service provided by the carrier within 18 months after the claim accrues. * * *

> (f) Government transportation.—*This section applies to transportation for the United States Government.* The time limitations under this section are extended, as related to transportation for or on behalf of the United States Government, *for 3 years from the later of the date of—*

> (1) *payment* of the rate for the transportation or service involved;

49 U.S.C. § 14705 (emphases added). By its terms, then, the ICA applies to a "carrier providing transportation or service," 49 U.S.C. § 14705(a), including "Government transportation," who brings an "action to recover charges for transportation or service," *id.,* and "payment of the rate for the transportation or service involved," 49 U.S.C. § 14705(f)(1). The statute draws no distinction between transportation services governed by a Government Bill of Lading on the one hand and a long-term contract on the other. It draws no distinction between a transportation-services contract requiring one delivery only, *e.g.,* a "spot movement," and one requiring all the deliveries an agency may need over an extended period of time. Nor does it leave any room for one to reasonably assert that Congress waived sovereign immunity for common carriers under both this statute as well as under the jurisdictional time period set forth in the Contract Disputes Act;

after all, section 14705(a) commands that a carrier "*must begin* a civil action to recover charges" within the time period set forth in the statute: 18 months after the claim accrues against private parties and "3 years" from the various trigger points set forth in the ICA for claims against the government.

An analysis of the administrative-dispute framework set up by the Transportation Act likewise compels the conclusion that the ICA and its amendments (*e.g.*, the Transportation Act) cover actions between a common carrier and the government for the payments owed on their agreement. The relevant provisions of the Act state:

> (c)(1) The Administrator shall adjudicate *transportation claims* which cannot be resolved by the agency procuring the *transportation services*, or the carrier or freight-forwarder presenting the bill.

> (2) A claim under this section shall be allowed only if it is received by the Administrator not later than 3 years (excluding time of war) after the later of the following dates:

> (A) The date of accrual of the claim.

> (B) The date payment for the transportation is made.

> (C) The date a refund for an overpayment for the transportation is made.

> (D) The date a deduction under subsection (d) of this section is made.

31 U.S.C. § 3726 (emphases added). In other words, the Act applies to "transportation claims" brought by a "carrier or freight-forwarder" that provided an agency with "transportation services." *See, e.g.*, 31 U.S.C. § 3726(b)(2). It too makes no distinction based on the number of deliveries, the complexity of the transportation agreement, whether an agreement re-

sulted from the procurement process or instead from a "spot movement," or whether a GBL or a tender agreement (or both) formed the parties' contract. In short, the unambiguous text of the ICA and its amendments, including the limitations period set forth therein, exclusively govern the jurisdictional time frame in which a common carrier must file a claim for charges against the government.

In addition, having the ICA govern all actions for the charges or money owed on contracts for government transportation services furthers the goal of making jurisdictional provisions clear and unambiguous. As many courts have emphasized, "[c]ourts and litigants are best served by [a] bright-line rule" in matters involving jurisdiction. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 202, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988). Indeed, "jurisdictional rules should be as simple as possible." *Cote v. Wadel*, 796 F.2d 981, 983 (7th Cir.1986); *accord Exchange Nat'l Bank v. Daniels*, 763 F.2d 286, 292 (7th Cir.1985) ("The first characteristic of a good jurisdictional rule is predictability and uniform application."); *In re Kilgus*, 811 F.2d 1112, 1117 (7th Cir.1987) ("The more mechanical the application of a jurisdictional rule, the better. The chief and often the only virtue of a jurisdictional rule is clarity.").

By making all actions for the charges on transportation-services contracts subject to the ICA's three-year filing period, common carriers doing business with the government need not speculate about (among other things) the jurisdictional time frame in which they must file a complaint in federal court. Carriers in Inter–Coastal's shoes, for example, will know that the ICA's three-year filing period applies, not the filing period governed by the CDA.

Our holding today thus has the benefit of establishing the bright-line rule that the Court of Federal Claims itself had established before *dicta* in *Dalton* may have cast some uncertainty upon it. *See Northeastern Penn.*, 32 Fed.Cl. at 74–75 & n. 8; *see also Scott v. United States*, 27 Fed.Cl. 829, 831 (1993) (holding that the ICA three-year limitations period governs and "unequivocally . . . supersedes the six year limitations period in 28 U.S.C. § 2501 in cases" involving claims for transportation charges); *Stapp Towing Co., Inc.*, 96–2 BCA ¶ 28,293, 1996 WL 202599 (A.S.B.C.A. Apr.22, 1996) (concluding that the ICA governs tender contracts and GBLs for transportation services even in light of *Dalton* ).

We take added confidence in reaching this conclusion in this particular case because, as with the GBL-based contract in *Dalton*, the tender agreements here specifically stated that the carrier was providing transportation services "pursuant to the" ICA, a reference that should have alerted a carrier about the ICA's applicability. Further, the tender agreements all cited the provision of the ICA that exempts transportation services (among other forms of government contracts) from the procurement procedures of Title 41. (*See, e.g.*, J.A. 87a (acknowledging Inter–Coastal's agreement to provide transportation services "pursuant to [49 U.S.C. § ] 10721 of the Interstate Commerce Act," re-codified at 49 U.S.C. § 13712).) While this ICA provision does not expressly exclude transportation agreements from those portions of Title 41 that house the CDA, it does provide more evidence that Congress intended to treat transportation contracts differently than other types of government contracts. Indeed, coupled with the plain meaning of the other ICA provisions discussed above, we think it dispositive. In-

ter–Coastal at one point apparently thought so too, for it initially availed itself of the ICA and sought to recover holdover charges using the Transportation Act's administrative procedures.

Notably, our holding today is also consistent with the interpretation contemplated by the GSA itself, the agency charged with construing the ICA administrative dispute-resolution process, *see* 31 U.S.C. § 3726. By promulgating 41 C.F.R. § 102–118.000 *et seq.*, GSA has indicated that the ICA administrative procedures apply equally to transportation-services contracts formed by a GBL or by a tender agreement, as well as other forms of contracts. *See, e.g.*, 41 C.F.R. § 102–118.10 (stating that the "transportation audit" established by the Transportation Act's amendments to the ICA, 31 U.S.C. § 3726, covers "tariffs, quotations, agreements, or tenders, as appropriate"); 41 C.F.R. § 102–118.130 (indicating that the Transportation Act amendments to the ICA do not prohibit a contracting agency from using an agreement other than a GBL; "[a]ny other non-conflicting applicable contracts or agreements between the [transportation-services provider] and an agency involving buying transportation services for Government traffic remain[ ] binding"); 41 C.F.R. § 102–118.165 (indicating an agency that discovers an error with a bill concerning a transportation-services agreement should notify the carrier in writing about the error and should include in that written notice the "complete tender or tariff authority," among other things); 41 C.F.R. § 102–118.185 (indicating that, under the Transportation Act, 31 U.S.C. § 3726, an agency contracting for transportation services "must reference the applicable contract or tender when buying transportation on a bill of lading (including GBLs)"); 41 C.F.R. § 102–118.260(a) (stat-

ing under the authority of 31 U.S.C. § 3726 that an agency contracting for transportation services should send "copies of each quotation, tender, or contract" with a transportation-services provider to the GSA); 41 C.F.R. § 102–118.265 (stating that the audit provisions established under the Transportation Act, 31 U.S.C. § 3726, require a comparison of the "charges on the bill against the charge permitted under the contract, rate, tender, or other agreement under which the [transportation-services provider] provided the transportation and/or transportation related services"). While we do not suggest that this case necessarily turns on principles of agency deference, we nevertheless think it instructive that the relevant agency here considered the ICA framework clear enough as to seemingly conclude that the ICA governs *all* claims that seek payment for the charges owed on contracts for transportation services, regardless of a contract's particular form, *e.g.*, tender agreement versus a GBL.

▉ Accordingly, we hold that the ICA, including its three-year filing period, applies to actions seeking to recover the "charges" or "payments" allegedly owed on contracts with the government for transportation services. Our holding today does not extend to contracts that involve services or property other than (or in addition to) transportation services.

**1**

Inter–Coastal's arguments to the contrary do not survive close examination. To begin with, Inter–Coastal emphasizes the plain meaning of the relevant CDA text, noting that on its face the statute applies to and thus governs "any express or implied contract ... entered into by an *executive agency* for-(2) the procurement of

services; [or] (4) the disposal of personal property." 41 U.S.C. §§ 602(a)(2), (4) (emphasis added). Inter–Coastal tries to bolster this analysis by tersely quoting from legislative history that simply restates the text of § 602(a) and acknowledges Congress' intent to have the CDA apply broadly. *See* S.Rep. No. 95–1118, at 17 (1978), U.S. Code Cong. & Admin. News 5235, 5251 (stating that the CDA applies to "all express or implied contracts entered into by an executive agency ... for the procurement of property ... [and] services" and noting that the "bill would have broad application in order to unify the diverse and often inconsistent procedures presently existing among the many procuring agencies").

This argument has many shortcomings. First, carried to its logical conclusion, the argument effectively asserts that the later-enacted CDA displaces the older, but more specific provisions of the ICA. So understood, however, that argument seems to conflict with our holding in *Dalton* that the CDA did not effect an implied repeal of the Transportation Act, *i.e.*, that the text of the CDA did not take precedence over the text of the ICA or its amendments. *See* 50 F.3d at 1018 ("[W]e conclude that Congress did not intend the general provisions of the Contract Disputes Act to supplant the pre-existing system of administrative review specifically designed for transportation services subject to [31 U.S.C. § ]3726.").

▉ And even if precedent did not squarely foreclose this issue (because, *e.g.*, *Dalton* expressly limited its holding to contracts where a GBL alone supplied the terms of the parties' agreement, *see* 50 F.3d at 1020–21), we see no reason to reach a different result anyway. The law strongly disfavors repeals by implication.

*E.g., Randall v. Loftsgaarden,* 478 U.S. 647, 661, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986) ("It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored."). "For a more recent statute to impliedly repeal an existing one, it is insufficient to demonstrate 'that the two statutes produce differing results when applied to the same factual situation.' * * * '[T]he legislative intent to repeal must be manifest in the "positive repugnancy" between the provisions' of the two statutes." *California v. United States,* 271 F.3d 1377, 1382 (Fed. Cir.2001) (quoting *United States v. Batchelder,* 442 U.S. 114, 122, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979) and *United States v. Borden Co.,* 308 U.S. 188, 199, 60 S.Ct. 182, 84 L.Ed. 181 (1939)). Given that high threshold, our court has recognized that repeals by implication occur "only when an enactment is irreconcilable with an earlier statute, or the enactment so comprehensively covers the subject matter of the earlier statute that it must have been intended as a substitute. In either case, Congress' intention to repeal the earlier law must be 'clear and manifest.'" *Todd v. Merit Sys. Prot. Bd.,* 55 F.3d 1574, 1577 (Fed.Cir.1995) (quoting *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976) and *Neptune Mut. Ass'n v. United States,* 862 F.2d 1546, 1551 (Fed.Cir.1988)).

The CDA text relied on by Inter–Coastal hardly evokes the "clear and manifest" intent needed to find a repeal by implication of the more transportation-specific provisions of the ICA. Further, it hardly renders the ICA and the CDA irreconcilable; as explained above, by applying the basic principle of interpretation that the more specific provision takes precedence over the general, the two are easily harmonized. Simply put, the ICA and the Transportation Act govern the wide variety of disputes about the amount of money owed on contracts for transportation services; absent a specific, contrary indication elsewhere, *e.g.,* in another federal statute, the CDA governs all other federal contracts for the "procurement of services," "the procurement of property," the "procurement of construction, alteration, repair or maintenance of real property," etc. *See* 31 U.S.C. §§ 602(a)(1)-(4).

Inter–Coastal's argument does nothing to address the principle about the more specific provision trumping the general provision or that principle's application in this particular dispute. Nor does it address the fact that since the CDA's enactment, Congress has amended the relevant provisions of the ICA on several occasions, another indication that the legislative branch in no way intended to repeal the relevant portions of the ICA upon the CDA's passage. Indeed, in 1978, the same year of the CDA's enactment, Congress again re-codified the ICA to simply clarify its existing provisions, not to work any substantive changes thereto. *See United States v. RSR Corp.,* 664 F.2d 1249, 1251 (5th Cir.1982) (discussing purpose of 1978 amendments to the ICA and citing H.R.Rep. No. 95–1395, 95th Cong., 1st Sess. 4, 9–10 (1978), *reprinted in* 1978 U.S.C.C.A.N. 3009, 3012–13, 3018). One would expect that had Congress intended the ICA to give way to the CDA, it would have said so clearly and unequivocally, especially in the same year in which it expressly considered and acted on both pieces of legislation.

Last, as the Court of Federal Claims also correctly noted, Congress did express the intent to give broad effect to the ICA as well. *See, e.g., Trans–Allied Audit,* 33 F.3d at 1027; *Dudgeon,* 213 F.Supp. at

714. Distilled to its essentials, then, this case presents us simply with a choice between a statute (the ICA) that applies broadly in the specific realm of contracts for transportation services, and another statute (the CDA) that applies to government contracts generally. For the reasons stated above, we have little difficulty in making our choice. And nor does the CDA's legislative history give us pause, for it merely re-states the relevant provision of the CDA and announces a broad statutory purpose; it does not reflect the "clear and manifest" intent to make the ICA, 49 U.S.C. § 14705(f), an empty letter.

### 2

On the other hand, Inter–Coastal's reliance on the "factors" discussed in *Dalton* does strike a persuasive chord. In particular, Inter–Coastal asserts that had the Court of Federal Claims considered and applied the "factors" (*i.e.*, the reasons) discussed in *Dalton*, it would have concluded that the CDA should govern. As Inter–Coastal sees it, the tender contracts here involved more complex terms than the simple GBL in *Dalton*; and thus, the administrative procedures established by the CDA can handle the more complex disputes arising from such an agreement better than the procedures established by the Transportation Act. Argues Inter–Coastal, the dispute here, for example, involves questions of contract interpretation that are better suited for a contracting officer and the CDA, not questions that involve the "mere counting of shipments and calculation of amounts owed." Further, the long-term contracts formed by Inter Coastal and the government, unlike the simple GBL-based contract in *Dalton*, did involve a contracting officer; a "crucial player in handling claims under the [CDA]."

Balanced against other concerns, we cannot agree. For one thing, our court cannot overlook the principle that the specific provision trumps the more general provision. And, as applied in this case, the ICA and the Transportation Act specifically address disputes involving transportation services with the government while the CDA only generally addresses contracts with the government. *See Dalton,* 50 F.3d at 1018. Further, as shown by the "well-recognized case law" cited above, Congress intended the ICA to cover a "broad scope." In this case, giving effect to that intent means simply that the ICA should cover actions that (as here) seek to recover payments allegedly owing on a contract for transportation services, even if the contract at issue consists of both a GBL and a tender agreement.

It also bears repeating that the tender agreements here reference the ICA as the controlling source of law; and they cite to the specific provision (49 U.S.C. § 13712) that excludes transportation services from the procurement provisions of Title 41, more evidence that transportation agreements with the government are not the same as other government contracts. So, in our view, Inter–Coastal can hardly claim that it simply fell into a jurisdictional trap for the unwary, since its contract specifically recognizes the ICA as the governing statute. And again, Inter–Coastal obviously labored under no confusion in this regard; as stated, it did avail itself of the Transportation Act's administrative procedures, filing its numerous claims with GSA in 1997. Having chosen that course, it cannot now hope to start the race anew using a new set of rules (namely, the procedures established by the CDA).

Sound judicial policy also supports this conclusion. As explained earlier, by an-

nouncing an interpretation that draws a clear line between government contracts generally and government transportation contracts specifically, claimants will not have to engage in the sort of jurisdictional guesswork that so often plagues other areas of the law. Nor will they have to consider whether, for example, their contract with the government consists solely (or perhaps "more") of a GBL-based agreement as opposed to a tender agreement, or vice-versa. And thus, jurisdiction will not bounce back and forth between the two statutes depending on how one party or the other can best characterize their agreement. In short, if the action involves the amount of money owed on a contract for transportation services—the vast majority of such contractual disputes, we suspect—claimants should and presumably will know to invoke the transportation-specific provisions of the ICA, not the generalized provisions of the CDA.

Citing *A–Transport Northwest Co., Inc. v. United States,* 36 F.3d 1576 (Fed.Cir. 1994), Inter–Coastal tries to strengthen its argument on this score by asserting that the tender agreements alone—not the tender agreements and the GBLs that issue at the outset of every delivery—formed the basis of the parties' contract. We have reason to doubt this assertion. After all, in *A–Transport,* unlike here, the government never issued a GBL because it terminated the parties' transportation-services contract before any deliveries ever became due. *See* 36 F.3d at 1578. Further, unlike here, the dispute in *A–Transport* focused on whether a tender agreement alone could constitute a binding contract; limiting our analysis to the facts of that case, we held that it could. 36 F.3d at 1581, 1584. In so concluding, however, we never suggested that such an agreement perforce excluded the possibility that a Gov-

ernment Bill of Lading could impose *additional* contractual duties onto those tender agreements. *See id.* at 1581. To the contrary, we stated that the "execution of the bills of lading may give rise to additional contractual obligations binding on the parties." *Id.*

At any rate, we need not belabor whether the tender agreements, the GBLs or some amalgam of both constituted the parties' contract. Under our holding today, such inquiries are irrelevant to the question about which federal statute governs an action for the charges owed on a contract with the government for transportation services.

3

The dissent brooks no disagreement with our analysis of the unambiguous text of 49 U.S.C. §§ 14705(a), (f) or 31 U.S.C. § 3726(c). To the contrary, our learned brother in dissent appears to acknowledge that at least prior to the 1978 enactment of the CDA, the ICA did govern actions for the charges owed on transportation services provided to the government. *See post* at 1359–60. Nor does the dissent mention any disagreement with GSA's own interpretation of the ICA or the goal of jurisdictional clarity. And the dissent says nothing about the fact that Inter–Coastal itself pursued the administrative-dispute procedures of the Transportation Act, only to change tack upon realizing (it would seem) that the jurisdictional time to sue under the ICA had passed.

Moreover, we believe the dissent's suggestion that a common carrier could sue under either the ICA or the CDA would conflict with the precise command of the ICA itself. As explained earlier, the ICA dictates that common carriers *"must begin*

a civil action to recover charges for transportation or service," 49 U.S.C. § 14705(a) (emphasis added), within "3 years" from (among other points) "the date of payment of the rate for the transportation or service involved," 49 U.S.C. § 14705(f)(1). The statute does not say that the suit "must begin" from *either* of the three dates described in section 14705(f) *or from the dates established independently in the CDA, e.g.,* 12 months after the contracting officer denied the contractor's claim, *see* 41 U.S.C. § 609(a)(3).

Remember, too, that we are dealing with suits against the government. So we should not readily infer that Congress so blithely waived immunity and gave a common carrier—unlike other government contractors—not one but two separate avenues for relief against the sovereign: one under the ICA and another under the CDA. *See generally United States v. Nordic Village, Inc.,* 503 U.S. 30, 33–34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (emphasizing that "[w]aivers of the Government's sovereign immunity, to be effective, must be unequivocally expressed" and "must be construed strictly in favor of the sovereign"); *accord Dep't of Army v. Blue Fox, Inc.,* 525 U.S. 255, 261, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999).

■ The dissent's view, on the other hand, would mean that carriers could essentially pick and choose when they wished to sue the government about the payments allegedly owed on their contract. As we see it, that understanding of the CDA–ICA interplay would not only abridge the specific mandate that Congress itself set forth in the ICA's limited waiver of immunity, *see* 49 U.S.C. §§ 14705(a), (f) (dictating that common carriers suing the government for charges "must begin" that suit within the three-year period set forth in subsection (f)); it also would prove inimical to the very notions of sovereign immunity, the waiver of which occurs only if " 'suit is brought in *exact compliance* with the terms of a statute under which the sovereign has consented to be sued.' " *Lundeen v. Mineta,* 291 F.3d 300, 304 (5th Cir.2002) (quoting *Koehler v. United States,* 153 F.3d 263, 265 (5th Cir.1998)) (emphasis added). In this case, Inter Coastal failed to comply with the terms of the waiver set forth in the ICA, the statute under which Congress specifically addressed and authorized suits by common carriers for the charges owed on a government contract for transportation services. And we simply do not believe that, having enacted a limited waiver of the government's sovereign immunity in the specific instance involving the "charges" allegedly owed on a common carrier agreement, Congress intended to waive immunity again in the exact same context upon passage of the broad text of the CDA. To find that Inter–Coastal could nevertheless sidestep the ICA jurisdictional limitation by using the CDA would mean that we had at minimum paid less than exacting deference to the express constraints that Congress itself has placed on lawsuits of this kind.

**B**

■ Having concluded that the ICA does control here, we must next resolve whether the Court of Federal Claims correctly pinpointed the time between 1994 and 1997—when the government made various "payments" on everything it believed it owed Inter–Coastal for various transportation services—as the starting point for the ICA's three-year filing period. Again, under the ICA, the three-year filing period begins to run "from the later

of" several dates, including "the date of (1) *payment of the rate for the transportation or service involved.*" 49 U.S.C. § 14705(f)(1) (emphasis added).

The trial court dismissed most of the "holdover" claims as barred by the ICA's three-year filing period, reasoning that under 49 U.S.C. § 14705(f)(1), "payment" took place at various points between 1994 and 1997 but in nearly all events before July 26, 1997, *i.e.*, outside the three-year cutoff point established by Inter–Coastal's filing in the Court of Federal Claims on July 26, 2000. *Inter–Coastal Xpress*, 49 Fed.Cl. at 540–42. Further, the court rejected Inter–Coastal's assertion that "payment" under the ICA did not occur until August 1999, when the government via the DOD issued "Settlement Certificates" that cited the GSA Board of Contract Appeals' decision on the holdover claims and declared that the government would not make any payments on them. According to the court, the "pertinent case law has never treated 'payment' as anything other than the initial payment of the rate for transportation services under the normal operation of a contract":

> In each case, *"payment" has been held to occur at the end of a normal process of performance: a GBL for a specific delivery is executed, that delivery is made, and the money is paid soon thereafter. In other words, "payment" in the case law is regarded as the basis for the dispute,* not the resolution of an earlier dispute via supplemental payment. When there is an allegedly insufficient payment, therefore, a carrier makes a claim; any settlement under that claim is not considered a new "payment." Indeed, if this definition of "payment" is accepted, the limitations period could be renewed whenever the

government attempts to settle a carrier's claim by means of the payment of money. It is foreseeable that, under [Inter–Coastal's] interpretation, even a payment by the government to satisfy a judgment of this court could be considered a new trigger for the three-year statute of limitations under section 14705. This tortured definition of "payment" will not be embraced by this court.

*Id.* at 541 (citing *True Transport, Inc. v. United States*, 224 Ct.Cl. 703, 705, 650 F.2d 288 (1980) and *Scott v. United States*, 27 Fed.Cl. 829, 831 (1993)) (emphasis added). In addition, the court noted that if Congress wanted the GSA's administrative adjudication to serve as the trigger date for the three-year filing period, it would have said so specifically. *Id.* And, as the court saw it, accepting Inter–Coastal's view that "payment" did not occur until after the contracting agency had issued its "Settlement Certificates" would frustrate Congress' goal of resolving transportation claims "in a relatively short period of time." *Id.* (citation omitted). Indeed, if "payment" did not occur until after final action by DOD, plaintiffs like Inter–Coastal could have almost double the three-year filing window to sue in the Court of Federal Claims, in derogation of Congress' stated intent. *Id.*

Inter–Coastal presents this same issue for our review, arguing again that "payment" under the CDA occurred only when, on August 8, 1999, the government decided via its Settlement Certificates to *"pay zero for holdover services provided by [Plaintiff] ICX."* (Appellant's Br. at 27.) Nothing in Inter–Coastal's argument dissuades us from subscribing to the Court of Federal Claims' well-reasoned analysis. As that court stated, the common-sense meaning

of the term "payment" would set the starting date as the time when the government paid the full amount allegedly owed during the ordinary course of performance, thereby triggering a dispute that its payments were insufficient. Otherwise, the three-year limitations period could not even begin to run until, *e.g.*, after the government had already agreed to settle the dispute and pay whatever amount was allegedly owing on the parties' transportation agreement. Congress surely did not intend to make the three-year period—a jurisdictional period—as boundless as this.

█ Inter–Coastal also tries to divide each agreement into one for "linehaul transportation" and another for "holdover services," thereby making use of Section 14705's mechanism for having the clock run from the later of "payment of the rate for the *transportation or service involved*." In Inter–Coastal's view, this point would again set the relevant starting time as August 8, 1999. But contrary to this assertion, the contracts between the parties were simply for transportation services— the transportation of "perishable subsistence" for the government. The "holdover" claims simply address a particular term within those contracts for payments that Inter–Coastal could additionally receive for situations involving a government-caused delay; it does not in and of itself represent a separate contract or "service," but merely a part of the same payment scheme for the same transportation services. Inter–Coastal cannot now divorce "holdover" services from transportation services, as the former simply arises in the course of performing the latter.

To conclude, then, Inter–Coastal received its "payment," as used in the ICA, during the 1994–1997 contract period—not when the adjudicatory process had already begun and the DOD, after the conclusion of that adjudicatory process, ultimately decided not to make "holdover" payments in August 1999. Accordingly, because the Court of Federal Claims correctly interpreted the meaning of "payment," and because it correctly held that the relevant starting point for purposes of the ICA occurred when the government purported to pay all that it owed on each particular shipment, the three-year filing period expired for nearly all of Inter–Coastal's "holdover" claims before July 26, 2000.

### III

For the reasons stated above, we uphold the decision by the Court of Federal Claims to dismiss most of Inter–Coastal's "holdover" claims for lack of jurisdiction. Our ruling of course does not affect the remaining 239 holdover claims for which the trial court has entered no judgment. Jurisdiction over those claims will simply depend on whether the "payment" dates provided by Inter–Coastal's amended complaint can satisfy the ICA's three-year filing period.

*AFFIRMED.*

FRIEDMAN, Senior Circuit Judge, dissenting.

1. In my opinion, the Contract Disputes Act ("Disputes Act") covers this dispute, and under its statute of limitations the plaintiff's complaint was timely filed.

I view the two statutes as complementary, not mutually exclusive. That is, the Interstate Commerce Act is the general regulatory statute that governs a motor carrier's operations, including the regulation of the service the carrier renders and the carrier's relations with its customers.

The Disputes Act, on the other hand, governs the resolution of disputes between a motor carrier and the federal government over contracts between them for transportation services, and thus covers this case. When the tender agreements stated that Inter–Coastal Xpress would provide transportation services "pursuant to" the Interstate Commerce Act, the carrier merely indicated that that Act was the regulatory basis for its operating authority. I do not read that statement, as the court apparently does, to suggest that the Interstate Commerce Act would govern any disputes the carrier might have with the government over its charges.

The Interstate Commerce Act is an old statute that, from its enactment, necessarily provided and prescribed the procedures governing disputes between carriers and their customers, including the federal government. Many years later Congress enacted the Disputes Act to unify the standards and provisions for the resolution of contract disputes between a wide variety of contractors and the government.

The language of the Disputes Act is broad. It covers "any express or implied contract ... entered into by an executive agency for (2) the procurement of services." 41 U.S.C. § 602(a). The tender agreements in this case were express contracts for the procurement of transportation services, and are similar to the contracts we routinely consider under the Disputes Act. They resulted from a government invitation for bids. They are lengthy and detailed contracts that cover virtually all aspects of the commercial relationship between the carrier and the government, and obligate the carrier to provide transportation services for the government for three years. Each tender agreement occupies more than thirty pages of the joint appendix. The issues here—the meaning of certain provisions of the tender agreements and whether they entitle the carrier to additional compensation for certain kinds of "holdover" services it provided—also are similar to the issues we frequently decide in cases under the Disputes Act.

I do not think the question of which statute governs the resolution of this dispute can be answered by invoking the canon of statutory construction that if an earlier more limited statute and a later more general statute appear in conflict, the earlier one trumps the later one. That principle may be invoked only if there is an otherwise irreconcilable conflict between two statutes. Here there is no such conflict. In my view, both statutes cover the carriers' transportation services for the government in this case, although they deal with different aspects of the relationship.

To me, the question is whether it may fairly be said that when Congress enacted the Disputes Act, it intended to exempt coverage of disputes between motor carriers and the federal government about the carriers' charges. In view of the broad purpose and broad language of the Disputes Act and the lack of any legislative history establishing that Congress did not intend to cover such disputes, I would hold that it is the Disputes Act, and not the Interstate Commerce Act that governs this dispute.

The court states that "Section 10721 of the ICA, now re-codified at 49 U.S.C. § 13712, generally exempts transportation-services agreements from the procurement procedures that ordinarily apply to other government contracts" and that the tender agreements "specifically mentioned" the Interstate Commerce Act and its provision

(49 U.S.C. § 13712) that "exempts transportation services from the general procurement provisions of Title 41 of the U.S.Code, the same title that houses the [Disputes Act]." The argument apparently is that since the Disputes Act is part of Title 41 (which deals with public contracts), the exception that § 13712 provides from other provisions of Title 41 somehow also covers the Disputes Act, which is also set forth in that title. I see no basis for that conclusion.

If resort be had to 49 U.S.C. § 10721, § 13712's predecessor, the conclusion is the same. Section 10721, a much longer provision, generally deals with carriers' charges for serving the United States. It sheds no light on whether the Disputes Act covers disputes over such charges.

2. This court's decision in *Dalton v. Sherwood Van Lines,* 50 F.3d 1014 (Fed. Cir.1995), is not inconsistent with my position. *Dalton* involved a dispute arising out of transportation for the government by a common carrier pursuant to government bills of lading. There was no overall contract that spelled out in detail the relationship between the two parties, pursuant to which the carrier agreed to provide transportation for a specific period, as did the tender agreements in this case. This court held that the Interstate Commerce Act, not the Disputes Act, covered such transportation. The court, however, described its decision as:

> a narrow one, limited to cases in which the government obtains transportation services from a common carrier pursuant to 49 U.S.C. § 10721 and in which the GBL constitutes the contract between the parties. We do not address cases in which transportation services are obtained through other means, such as contracts for continuing transportation services over a period of time.... A different analysis may be appropriate with regard to contract-based claims arising in that setting.

50 F.3d at 1020–21.

The present case involves the issue the court expressly left open in *Dalton,* for which it suggested that "[a] different analysis may be appropriate."

3. I see no reason for the court's broad pronouncement that the Interstate Commerce Act's limitations period governs "all actions seeking payment of the charges owed on a common carrier agreement for 'transportation services' with the government." All the court need conclude to decide this case in the government's favor is that the Interstate Commerce Act covers these particular contracts. There is neither need nor occasion to go beyond that ruling and announce the broader principle the court enunciates. Perhaps that may ultimately turn out to be the effect of the present decision, but we should not foreclose the possibility that in some future case, presently not discernable, that Act might not apply.

4. In view of the absence of any explicit Congressional discussion of this question, perhaps an appropriate solution to the problem of statutory interpretation would be to hold that a carrier having a dispute with the federal government over its transportation charges may assert its claim under either the Interstate Commerce Act or the Disputes Act, but not under both. Under that approach, a critical question in this case would be whether Inter–Coastal Xpress filed a certified claim with the contracting officer for its holdover charges, as the Disputes Act would require it to do. *See* 41 U.S.C. § 605(c)(1). If such a claim has been submitted, the Con-

**1378**

tract Disputes Act would apply. If however, such a claim was not submitted, then Inter Coastal Xpress would be viewed as having invoked its remedy under the Interstate Commerce Act, and such an attempt would be untimely. Moreover, because Inter–Coastal Xpress invoked the administrative procedures under the Interstate Commerce Act it may be precluded from thereafter proceeding under the Disputes Act.

In answering this proposal, the court apparently suggests that the provision in the Interstate Commerce Act that a carrier suing the government for transportation charges in federal court "must begin" such action within three years precludes an alternative action under the Disputes Act. That language, however, is a familiar statute of limitations formulation. It does not address the question whether such action is the only available one for this dispute.